## Larsen Chelsey Realty Company *v.*
## S. Craig Larsen et al.
## (14941)

Peters, C. J., and Callahan, Berdon, Katz and Palmer, Js.

481

Argued November 1, 1994—decision released April 4, 1995

*Raymond A. Garcia,* with whom was *Constantine G. Antipas,* for the appellant (plaintiff).

*Gary P. Sklaver,* with whom, on the brief, was *Irving H. Perlmutter,* for the appellee (named defendant).

*Patrick J. Monahan,* with whom, on the brief, was *Denise M. Bourque,* for the appellee (defendant H. Pearce Company).

BERDON, J. The plaintiff, Larsen Chelsey Realty Company, instituted this thirteen count action against the defendants, S. Craig Larsen (Larsen) and H. Pearce Company (Pearce Company), seeking monetary damages, legal fees and punitive damages. The plaintiff was a real estate broker with an office in New Haven. Larsen is the former president of the plaintiff and an employee of Pearce Company, a competing real estate broker in New Haven. The ten counts directed against Larsen alleged: in the first and third counts, libel; in the second and fourth counts, slander; in the fifth count, breach of fiduciary duty; in the sixth count, unfair competition; in the seventh count, theft of corporate opportunity; in the eighth count, interference with contractual relations; in the ninth count, conversion; and in the tenth count, violations of the Connecticut Unfair Trade Practices Act (CUTPA). General Statutes § 42-110a et seq. The three counts directed against Pearce Company alleged: in the eleventh count, vicarious responsibility under the doctrine of respondeat superior for certain actions taken by Larsen; in the twelfth count, "tortious conduct," including unfair competition, unfair trade practices, and interference with contractual relations; and in the thirteenth count, violations of CUTPA.[1]

At trial, after both sides had rested, the trial court granted Pearce Company's motion for a directed verdict on all of the counts against it. The trial court also granted Larsen's motion for a directed verdict on the fourth count, which alleged slander, and on the ninth count, which alleged conversion. The eight remaining counts were submitted to the jury. The jury concluded that the plaintiff had failed to sustain its burden of proof on the second count, which alleged slander, and on the

---

[1] The defendants, in their answers to the complaint, asserted several special defenses. We need not discuss these defenses, however, in order to decide the issues raised in this appeal.

third count, which alleged libel.[2] The jury returned a verdict for the plaintiff against Larsen on six of the remaining counts in the following amounts: on the first count, libel, $165; on the fifth count, breach of fiduciary duty, $6000; on the sixth count, unfair competition, $1; on the seventh count, theft of corporate opportunity, $1; on the eighth count, tortious interference with business relations, $1; and on the tenth count, violations of CUTPA, $1. The court subsequently granted Larsen's motion to set aside the jury verdicts on the first count, which alleged libel, and on the tenth count, which alleged violations of CUTPA. The plaintiff has appealed, claiming error in these and other rulings of the trial court.[3] We reverse in part the judgment of the trial court.

The jury reasonably could have found the following facts. The plaintiff was formed in 1987 as a combination of Chelsey Realty Company and Larsen Realty Company, the latter of which was owned by Larsen's father, Stuart Larsen. The plaintiff hired Larsen as its president in October, 1987, and it began operations in January, 1988. By all accounts, however, the new company was less than a financial success. Throughout 1988, the company never had a profitable month.

In 1989, the events which form the basis for this action began to unfold. In January, Chester A. Zaniewski, the chairman of the plaintiff's board of directors, met with Larsen and expressed his displeasure with the performance of the company. Larsen, who originally had taken the job with a salary of $80,000, agreed to tie his salary to commissions instead. He and Zaniewski also agreed that Larsen would try to find a buyer or an investor for the plaintiff.

---

[2] The plaintiff has not appealed these verdicts.

[3] The plaintiff appealed from the judgment of the trial court to the Appellate Court, and this appeal was transferred to this court pursuant to Practice Book § 4023 and General Statutes § 51-199 (c).

On February 1, Larsen met with Barbara Pearce, president of the competing Pearce Company, to learn whether Pearce Company might be interested in buying or investing in the plaintiff. Larsen had been a commercial sales agent for Pearce Company in 1983, and he had a good relationship with the company and the Pearce family. At this meeting, Pearce informed Larsen that her company was not interested in buying or investing in the plaintiff, but she did ask whether he would be interested in taking a position with Pearce Company. At that meeting Larsen gave Pearce a list of the brokers working for the plaintiff. Larsen never discussed this meeting with Zaniewski. Larsen again met with Pearce on February 21, 23 and 24.

On February 27, unbeknown to Zaniewski, Larsen told the plaintiff's employee brokers that the company was going to close, and he encouraged them to contact Pearce for jobs. Meanwhile, Larsen prepared a letter to mail to the plaintiff's clients and business contacts. The letter, dated and mailed on March 6, 1989, stated that the plaintiff was going to cease independent operations and would merge with Pearce Company.[4] That same day, Larsen wrote a letter to the New Haven board of realtors advising it that the plaintiff would be

---

[4] The March 6, 1989 letter read as follows:

"Dear Sir or Madam:

It is with great pleasure and much excitement that I share with you the following news. As of April 1, 1989, the Larsen Chelsey Realty Company of New Haven will merge its personnel with the H. Pearce Company of North Haven, Connecticut. This joining of forces under the H. Pearce Company's corporate umbrella will provide both our firms the opportunity to enhance the level of service and commitment to our existing and future clients.

The Larsen Chelsey Realty Company was formulated and built upon the objective of providing a high level of personal service, knowledge, and expertise in the field of real estate. To this end we were successful; however, we also learned that to provide these services at the levels requested, we had to grow and expand our operations at unrealistic proportions. The H. Pearce Company's business philosophy and commitment to excellence so

"closing," that he and two other realtors would be "transferring" to Pearce Company, and that "[w]e are using the month of March to finish up all old business and to transfer any new business to [Pearce Company]."[5] Larsen then began to solicit agents and sign listings on behalf of Pearce Company.

closely parallels our own that a consolidation of efforts and objectives presents the ideal opportunity to meet the demands of the greater New Haven business community in the best possible manner.

My associates and I will be working hand in hand with the H. Pearce Company professionals to continue and broaden the scope of service and commitment to your organization. We look forward to better serving you now and in the years to come.

As President of the Larsen Realty Company, I thank you for your past support and ask you for your continued confidence at the H. Pearce Company.

> Sincerely,
> S. Craig Larsen
> President"

[5] The letter Larsen wrote to the greater New Haven board of realtors read as follows:

"Ms. Joan Barrows
Greater New Haven Board of Realtors
P.O. Box 1426
New Haven, CT 06506
Dear Joan:

Please be advised that as of April 1, 1989, the Larsen Chelsey Realty Company at 555 Long Wharf Drive, New Haven and 1360 Whitney Avenue, Hamden will be closing. The following realtors will be transferring to the H. Pearce Company in North Haven:

| Realtor | Effective Transfer Date |
| --- | --- |
| S. Craig Larsen (DR) | March 6, 1989 |
| Paul Celotto | March 6, 1989 |
| Joan Veillette | March 6, 1989 |

We are using the month of March to finish up all old business and to transfer any new business to the H. Pearce Company. This letter should also serve as notice to cancel all C.I.D. and M.L.S. books to both our Hamden and New Haven office to be effective April 1, 1989.

Thank you for your cooperation [in] this matter. Should you have any questions, please feel free to contact me.

> Sincerely,
> S. Craig Larsen
> President"

Two days later, on March 8, Zaniewski and his business adviser, Irwin Ganson, visited Larsen to discuss his attempts to sell the company. While waiting in a conference room, they discovered copies of the March 6 letter that Larsen had prepared and mailed. Zaniewski and Ganson confronted him with the letter and then consulted counsel. Two days later, on March 10, they returned to the office and fired him. On the same day, Larsen spoke to a representative of the owner of the building that leased space to the plaintiff and told her that the plaintiff was closing and moving that day. The owner of the building then applied for and received a prejudgment remedy, which allowed it to change the locks on the plaintiff's offices and prevent the plaintiff's agents from removing furniture, equipment, books and records. We will discuss additional facts as they become relevant.

I

We first consider the plaintiff's claim that the trial court improperly set aside the jury's verdict for the plaintiff against Larsen on the first and tenth counts of the complaint, which alleged libel and violations of CUTPA.

A

The plaintiff initially claims that the trial court improperly set aside the jury verdict for the plaintiff on the first count of the complaint, which alleged that Larsen had libeled the plaintiff in the March 6 letter mailed to the plaintiff's clients.[6]

The following additional facts are relevant to this claim. Before the court instructed the jury, Larsen moved for a directed verdict on several counts of the complaint, including the libel count. The trial court denied his motion. Thereafter, the jury returned a ver-

---

[6] See footnote 4.

dict for the plaintiff on the libel count. Larsen then moved for the court to set aside the verdict on that count, which had awarded $165 in damages to the plaintiff, and to render judgment for him in accordance with Practice Book § 321.[7] The plaintiff also moved to set aside the verdict against Larsen as to damages only, claiming that the jury verdict for the plaintiff on the first count was inadequate as a matter of law.

The trial court held a hearing on May 14, 1993, on these and other posttrial motions filed by the parties. The court did not rule on these motions in court on that day. Neither party received notice of any action taken by the court. On July 13, 1993, the parties returned to court for a hearing on motions related to other counts of the complaint. During this hearing, they reminded the court that it apparently had not yet ruled on their motions to set aside the verdict as to count one. The court informed the parties that it, in fact, had made its decision in chambers after they had left court on May 14. Apparently, the clerk's office had failed to

---

[7] Practice Book § 321 provides: "Whenever a motion for a directed verdict made at any time after the close of the plaintiff's case in chief is denied or for any reason is not granted, the court is deemed to have submitted the action to the jury subject to a later determination of the legal questions raised by the motion. The defendant may offer evidence in the event the motion is not granted, without having reserved the right to do so and to the same extent as if the motion had not been made. After the acceptance of a verdict and within the time stated in Sec. 320 for filing a motion to set a verdict aside, a party who has moved for a directed verdict may move to have the verdict and any judgment rendered thereon set aside and have judgment rendered in accordance with his motion for a directed verdict; or if a verdict was not returned such party may move for judgment in accordance with his motion for a directed verdict within the aforesaid time after the jury have been discharged from consideration of the case. If a verdict was returned the court may allow the judgment to stand or may set the verdict aside and either order a new trial or direct the entry of judgment as if the requested verdict had been directed. If no verdict was returned the court may direct the entry of judgment as if the requested verdict had been directed or may order a new trial."

notify counsel for the parties of the court's orders.[8] The court stated that it had denied the plaintiff's motion for a new trial on damages[9] but had granted Larsen's motion to set aside the plaintiff's verdict on the libel count and to render judgment for Larsen. The court did not explain the grounds for its decision either in a written memorandum of decision or orally on the record, nor did either party ever ask the court to articulate its reasoning.

Faced with such a scant record, we are unable to determine whether the trial court was correct in setting aside the jury verdict for the plaintiff and rendering judgment for Larsen on this count. In cases such as this, where meaningful appellate review is precluded by the incompleteness of the record, we have taken two approaches. Under the first approach, and the one we usually take, we have disposed of the appeal by summarily affirming the decision of the trial court. See, e.g., *Ginsberg* v. *Fusaro*, 225 Conn. 420, 431–32, 623 A.2d 1014 (1993) (trial court, in *denying* motion to set aside verdict, had failed to file memorandum of decision). Reasoning that it is ultimately the responsibility of the appellant to secure an adequate appellate record, we have refused to entertain claims of error brought by a party who has failed to undertake this obligation. Id. Under the second approach, however, we have utilized this court's authority, pursuant to Practice Book § 4061,[10] to remand the case to the trial court in order that it may articulate the grounds for its decision. See, e.g., *Rostain* v. *Rostain*, 213 Conn. 686, 694, 569 A.2d 1126 (1990).

---

[8] The record indicates that the trial court did enter orders on these motions on May 14, 1993.

[9] In this appeal, the plaintiff has not pursued the trial court's denial of its motion on the sufficiency of the damages.

[10] Practice Book § 4061 provides in relevant part: "If the court deems it necessary to the proper disposition of the cause, it may remand the case for a further articulation of the basis of the trial court's factual findings or decision. . . ."

We conclude that, under the facts of this case, the second approach is more appropriate in this instance. We reach this result for several reasons. First, a trial court's decision to set aside a jury verdict can implicate a party's constitutional right to a trial by jury. *Young* v. *Data Switch Corp.*, 231 Conn. 95, 101, 646 A.2d 852 (1994). We must be certain, therefore, that the trial court's decision to set aside the jury verdict for the plaintiff on the first count of the complaint has not infringed this right. Second, Practice Book § 322 provides that a trial court, upon granting a motion to set aside a verdict, *"shall* file a memorandum stating the grounds of its decision."[11] (Emphasis added.) It is undisputed that the trial court in this case did not comply with this requirement. Finally, the parties did not receive notice of the court's ruling until they raised the issue during a hearing on another issue two months later.

Under these circumstances, and because of our respect for the integrity of the jury verdict, we believe that in order to dispose of this issue properly we must remand this count to the trial court, pursuant to Practice Book § 4061, for an articulation of its grounds for setting aside the jury verdict for the plaintiff, as required by Practice Book § 322.[12]

### B

The trial court also set aside the jury verdict[13] for the plaintiff on the tenth count of the complaint, which

---

[11] "While a memorandum of decision is not legally required on the *denial* of the motion to set aside the verdict but only on the granting of it, it is sound practice, where the motion is not frivolous, to set forth in a memorandum the basic reasons why the motion is denied." (Emphasis added.) W. Moller & W. Horton, Connecticut Practice—Practice Book Annotated, Superior Court Civil Rules (1989) § 322, p. 517, comment.

[12] See footnote 45.

[13] After this case was tried, we held that parties are *not entitled* to a jury trial on violations of CUTPA. *Associated Investment Co. Ltd. Partnership*

alleged that Larsen had violated CUTPA. See General Statutes § 42-110a et seq. The trial court based its decision on two factors.[14] First, the court considered CUTPA's requirement that any claim arising under the act must involve "the conduct of any trade or commerce." General Statutes § 42-110b (a). Finding that "the pleadings and the evidence repeatedly describe an employer-employee relationship" between the plaintiff and Larsen, the trial court concluded that such a relationship is not "trade or commerce" and, therefore, could not be the basis for a CUTPA claim. Second, the trial court considered the impact of our decision in *Jackson* v. *R. G. Whipple, Inc.*, 225 Conn. 705, 627 A.2d 374 (1993), which was released shortly after the jury in this case returned a verdict for the plaintiff on the CUTPA count. The trial court interpreted our holding in *Jackson* as stating that a plaintiff can only prevail in a CUTPA action if the plaintiff possesses some type of "consumer relationship" with the defendant. Therefore, on the basis of its finding that the plaintiff and Larsen had an employer-employee relationship, rather than a consumer relationship, the trial court set aside the jury verdict for the plaintiff on the CUTPA count.

We conclude that in setting aside the verdict, the trial court (1) improperly focused on the employer-employee relationship between the plaintiff and Larsen, rather than on his anticompetitive activities that were outside the scope of his employment, and (2) incorrectly interpreted this court's holding in *Jackson*. Accordingly, we reverse the judgment of the trial court.

v. *Williams Associates IV*, 230 Conn. 148, 162, 645 A.2d 505 (1994). A party who wishes CUTPA issues to be tried to the court, therefore, need only move to strike such a case from the jury list. If the parties fail to take such action, however, CUTPA issues may be tried to the jury. See, e.g., *A-G Foods, Inc.* v. *Pepperidge Farm, Inc.*, 216 Conn. 200, 579 A.2d 69 (1990).

[14] On appeal, the parties focus only on the relationship between the plaintiff and Larsen. They do not argue that Larsen's actions fail, as a matter of law, to constitute a violation of CUTPA. See part II C of this opinion.

CUTPA, by its own terms, applies to a broad spectrum of commercial activity.[15] The operative provision of the act, § 42-110b (a), states merely that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Trade or commerce, in turn, is broadly defined as "the advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value in this state." General Statutes § 42-110a (4). The entire act is remedial in character; General Statutes § 42-110b (d); *Hinchliffe* v. *American Motors Corp.*, 184 Conn. 607, 615 n.4, 440 A.2d 810 (1981); and must "be liberally construed in favor of those whom the legislature intended to benefit." (Internal quotation marks omitted.) *Concept Associates, Ltd.* v. *Board of Tax Review*, 229 Conn. 618, 623, 642 A.2d 1186 (1994).

The trial court, in determining whether Larsen had engaged in "trade or commerce" for purposes of a CUTPA violation, concluded that "the pleadings and the evidence repeatedly describe an employer-employee relationship" and "there is no allegation in the complaint which describes [Larsen's] behavior as CUTPA violations committed 'in the conduct of any trade or commerce.' " Therefore, relying on the holding of the Appellate Court in *Quimby* v. *Kimberly Clark Corp.*, 28 Conn. App. 660, 613 A.2d 838 (1992), the trial court set aside the jury verdict. We conclude that the trial court's analysis was not correct for two reasons. First, the Appellate Court's decision in *Quimby* does not apply to this case. Second, the trial court failed to consider Larsen's activities, rather than his relationship to the plaintiff, as a basis for a CUTPA violation.

---

[15] See part II C of this opinion.

In *Quimby*, the plaintiff employee contended that her employer, which was self-insured for the purposes of workers' compensation, had administered her claim of injury improperly. Specifically, the plaintiff claimed as CUTPA violations "the defendant's failure to pay benefits in a timely manner, to investigate reasonably and promptly the plaintiff's claim and to enter into a reasonable resolution of the plaintiff's claim . . . ." Id., 669–70. The Appellate Court, however, rejected this claim: "The plaintiff does not allege that the defendant committed these acts 'in the conduct of any trade or commerce.' . . . The relationship in this case is not between a consumer and a commercial vendor, but rather between an employer and an employee. There is no allegation in the complaint that the defendant advertised, sold, leased or distributed any services or property to the plaintiff." Id., 670.

The Appellate Court's decision in *Quimby* addressed only the applicability of CUTPA to acts occurring within the very limited confines of the employer-employee relationship. The misconduct revolved entirely around administrative shortcomings and an intracompany workers' compensation dispute. Without deciding the validity of *Quimby*,[16] we conclude that its holding is not relevant to the case before us.

In this case, the acts of which the plaintiff complains involve conduct occurring outside the confines of the employer-employee relationship. Unlike the situation in *Quimby*, this case presents a fact pattern that involves a potentially viable cause of action under CUTPA because Larsen's allegedly tortious conduct was outside the scope of his employment relationship

[16] We emphasize that we do not decide today whether the Appellate Court's holding in *Quimby* accurately sets forth the law with respect to CUTPA's applicability to employer-employee relationships. We merely conclude that the holding in *Quimby*, even if correct, is inapposite to the facts of this case.

with the plaintiff. The plaintiff contends, in short, that Larsen accepted a job with a competing real estate broker and then, acting as a competitor, took actions that harmed the plaintiff. Because these allegations lie outside the narrow confines of the employer-employee relationship and may constitute a violation of CUTPA, the trial court should not have set aside the jury verdict for the plaintiff on this basis.

Having determined that the Appellate Court's decision in *Quimby* is inapposite to this case, the issue then becomes whether the jury reasonably could have found that Larsen's activities implicated trade or commerce. We conclude that the jury could have so found.

The plaintiff presented evidence showing that Larsen, while still the president of the plaintiff, was offered and subsequently accepted a position at a real estate brokerage firm which was an acknowledged competitor of the plaintiff. Both companies were in the business of selling and leasing real estate to the public. The evidence showed that the March 6 letter prepared and mailed by Larsen[17] to clients of the plaintiff falsely stated that the plaintiff would cease operations and merge its personnel with Pearce Company. Finally, Larsen admitted instructing the New Haven board of realtors that he no longer was affiliated with the plaintiff and instead was affiliated with Pearce Company, and that the plaintiff was going out of business.[18] These activities implicated the services of both Larsen and the plaintiff as real estate brokers in the New Haven area and thus implicated trade or commerce under CUTPA.

The trial court also was incorrect in relying on our decision in *Jackson* v. *R. G. Whipple, Inc.*, supra, 225 Conn. 705, for its assertion that a CUTPA violation can

[17] See footnote 4.
[18] See footnote 5.

only arise out of a "consumer relationship." In *Jackson*, the plaintiff owned a mobile home that was located on property owned by a third party. The property owner, wishing to remove the mobile home, retained an attorney to initiate eviction proceedings. The plaintiff subsequently sued the property owner's attorney under CUTPA, claiming that as a provider of legal services to the property owner, the attorney had caused damage to her mobile home.

We rejected the plaintiff's claim as an impermissible infringement on an attorney's duty of loyalty to his or her client: "Imposing liability under CUTPA on attorneys for their representation of a party opponent in litigation would not comport with a lawyer's duty of undivided loyalty to his or her client. This consideration compels a conclusion that the trial court properly determined that the plaintiff did not have the requisite relationship with [the property owner's attorney] to allow [the plaintiff] to bring suit against [the attorney] under § 42-110g of CUTPA. Consequently, the plaintiff cannot prevail . . . ." Id., 729.

According to the trial court, we rejected the plaintiff's claim in *Jackson* not because it would have impermissibly infringed on the attorney-client relationship, but because the plaintiff and the attorney did not share a "consumer relationship." Concluding, therefore, that "[n]owhere in the pleadings has the plaintiff in this case alleged a consumer relationship between itself and the defendant," the trial court in this case set aside the jury verdict for the plaintiff on the CUTPA count against Larsen.

The trial court has misinterpreted our holding in *Jackson*. Although we acknowledge the presence of dicta in *Jackson* pertaining to consumer relationships, our holding in that case was merely that allowing a plaintiff to sue her opponent's attorney under CUTPA

would infringe on the attorney-client relationship. Indeed, we emphasized that it was the sanctity of the attorney-client relationship that "compels" such a conclusion. Id. Elsewhere in the *Jackson* opinion we reiterated the narrowness of our holding: "[I]n this case we conclude that in a situation where a party to a lawsuit sues the adversary's lawyer, CUTPA does not provide a private cause of action." Id., 726 n.15. In other words, we declined to recognize the right of that client's opponent to sue the attorney under CUTPA on the basis of the professional services the attorney had rendered for the client.[19]

We previously have stated in no uncertain terms that CUTPA imposes no requirement of a consumer relationship. In *McLaughlin Ford, Inc.* v. *Ford Motor Co.*, 192 Conn. 558, 473 A.2d 1185 (1984), we concluded that "CUTPA is not limited to conduct involving consumer injury" and that "a competitor or other business person can maintain a CUTPA cause of action without showing consumer injury." Id., 566, 567; see *Della Construction, Inc.* v. *Lane Construction Co.*, 42 Conn. Sup. 202, 612 A.2d 147 (1991). Federal district courts interpreting Connecticut law also have reached this conclusion. See, e.g., *Dial Corp.* v. *Manghnani Investment Corp.*, 659 F. Sup. 1230 (D. Conn. 1987).

Even if we were to revisit this issue, however, we would reach the same conclusion that the application of CUTPA does not depend upon a consumer relationship. In making this determination we find it is relevant to consider the words of the statute, the legislative history and the legislative policy it was designed to implement. *United Illuminating Co.* v. *Groppo*, 220 Conn. 749, 756, 601 A.2d 1005 (1992).

---

[19] We hasten to add, however, that the entrepreneurial aspects of the practice of law, such as attorney advertising, remain well within the scope of CUTPA. *Heslin* v. *Connecticut Law Clinic of Trantolo & Trantolo*, 190 Conn. 510, 515, 461 A.2d 938 (1983); see also *Jackson* v. *R. G. Whipple, Inc.*, supra, 225 Conn. 729–31 (*Berdon, J.*, concurring).

First, there is no indication in the language of CUTPA to support the view that violations under the act can arise only from consumer relationships. Indeed, various provisions of CUTPA reveal that the opposite is true. CUTPA provides a private cause of action to "[a]ny person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a [prohibited] method, act or practice . . . ." General Statutes § 42-110g (a). "Person," in turn, is defined as "a natural person, corporation, trust, partnership, incorporated or unincorporated association, and any other legal entity . . . ." General Statutes § 42-110a (3). If the legislature had intended to restrict private actions under CUTPA only to consumers or to those parties engaged in a consumer relationship, it could have done so by limiting the scope of CUTPA causes of action or the definition of "person," such as by limiting the latter term to "any party to a consumer relationship." "The General Assembly has not seen fit to limit expressly the statute's coverage to instances involving consumer injury, and we decline to insert that limitation." *McLaughlin Ford, Inc.* v. *Ford Motor Co.*, supra, 192 Conn. 566–67.

Second, the legislative history of CUTPA reveals that, although consumers were expected to be a major beneficiary of its passage, the act was designed to provide protection to a much broader class. According to Representative Howard A. Newman, who reported the CUTPA legislation out of committee to the House of Representatives, the act "gives honest businessmen great protection [against] deceptive or unscrupulous [businessmen] who by unfair methods of competition and deceptive advertising, etc., unlawfully divert trade away from law abiding businessmen." 16 H.R. Proc., Pt. 14, 1973 Sess., p. 7323. Other supporters of the bill made similar comments. See, e.g., Conn. Joint Standing Committee Hearings, General Law, Pt. 2, 1973

Sess., p. 724, remarks of Stuart Dear, a member of the board of directors of the Connecticut Consumer Association (CUTPA will "assist the businessman in not losing out to those members of the business community who won't play fair"); Conn. Joint Standing Committee Hearings, General Law, Pt. 1, 1978 Sess., pp. 307–308, remarks of Assistant Attorney General Robert M. Langer (CUTPA covers transactions "between one business and another business").

Finally, the legislature clearly announced its policy for interpreting CUTPA by directing us to the federal legislation upon which CUTPA is modeled. According to § 42-110b (b), courts construing the scope of CUTPA "shall be guided by interpretations given by the Federal Trade Commission and the federal courts to Section 5 (a) (1) of the Federal Trade Commission Act (15 U.S.C. § 45 (a) (1)) . . . ."[20] The federal courts have repeatedly and historically applied that act's provisions to situations not involving consumers. See, e.g., *Yamaha Motor Co., Ltd.* v. *Federal Trade Commission,* 657 F.2d 971 (8th Cir. 1981), cert. denied sub nom. *Brunswick Corp.* v. *Federal Trade Commission,* 456 U.S. 915, 102 S. Ct. 1768, 72 L. Ed. 2d 174 (1982) (agreement between competitors not to compete); *Sandura Co.* v. *Federal Trade Commission,* 339 F.2d 847 (6th Cir. 1964) (same); *American Tobacco Co.* v. *Federal Trade Commission,* 9 F.2d 570 (2d Cir. 1925), aff'd, 274 U.S. 543, 47 S. Ct. 663, 71 L. Ed. 1193 (1927) (wholesaler's refusal to deal).

Accordingly, the trial court was incorrect both in holding that a violation of CUTPA can only arise from

---

[20] The full text of § 42-110b (b) provides: "It is the intent of the legislature that in construing subsection (a) of this section, the commissioner and the courts of this state shall be guided by interpretations given by the Federal Trade Commission and the federal courts to Section 5 (a) (1) of the Federal Trade Commission Act (15 U.S.C. § 45 (a) (1)), as from time to time amended."

a "consumer relationship" and in setting aside the jury verdict on that ground. We therefore order the trial court to reinstate the verdict for the plaintiff against Larsen on the tenth count in the amount of $1 and remand that count to the trial court so that it may consider the plaintiff's claims for punitive damages and attorney's fees under the tenth count of the complaint.[21]

## II

We next consider the plaintiff's claim that the trial court improperly directed the jury to return verdicts in favor of Pearce Company on the eleventh, twelfth and thirteenth counts of the complaint.

A trial court may direct a jury to reach a verdict if it determines that the jury could not reasonably and legally reach a contrary conclusion. *Krawczyk* v. *Stingle*, 208 Conn. 239, 244, 543 A.2d 733 (1988); *Bound Brook Assn.* v. *Norwalk*, 198 Conn. 660, 667, 504 A.2d 1047, cert. denied, 479 U.S. 819, 107 S. Ct. 81, 93 L. Ed. 2d 36 (1986). Directed verdicts, however, are not favored. *Fleming* v. *Garnett*, 231 Conn. 77, 83, 646 A.2d 1308 (1994). "It must always be borne in mind that litigants have a constitutional right to have issues of fact decided by the jury and not by the court." *Ardoline* v. *Keegan*, 140 Conn. 552, 555, 102 A.2d 352 (1954). Furthermore, there is a practical reason for this policy: "Where the trial court's decision to direct a verdict is determined to have been erroneous, the parties and the judicial system are subjected to the burdens of a new trial. The preferred procedure, therefore, is to submit

___

[21] During the trial, the parties stipulated that the court, rather than the jury, would rule on the issue of punitive damages and expenses of litigation under CUTPA. Because we have concluded that the trial court was incorrect in setting aside the verdict of $1 in compensatory damages for the plaintiff on this count, we remand to the trial court the issue of whether the plaintiff is entitled to punitive damages and attorney's fees under CUTPA. See generally part II C of this opinion.

the issues to the jury, and then to set aside the verdict. Finding error in such a case, this court could simply direct that the verdict be reinstated. See *Santor v. Balnis*, 151 Conn. 434, 437, 199 A.2d 2 (1964)." *Boehm* v. *Kish*, 201 Conn. 385, 394, 517 A.2d 624 (1986).

In reviewing the trial court's decision to direct a verdict, this court considers all the evidence, including reasonable inferences, in the light most favorable to the party against whom the verdict was directed. *Fleming* v. *Garnett*, supra, 231 Conn. 83. The plaintiff now argues that the trial court improperly concluded that the jury, relying on the evidence that had been presented, could not reasonably or legally have returned a verdict for the plaintiff against Pearce Company on any of these counts.

A

In the eleventh count of its complaint, the plaintiff alleged that Pearce Company was liable under the doctrine of respondeat superior for Larsen's acts pertaining to the common law torts of unfair competition, unfair trade practices, conversion and interference with contractual relations. Under the doctrine of respondeat superior, a master is liable for the wilful torts of his servant committed within the scope of the servant's employment and in furtherance of his master's business. *Pelletier* v. *Bilbiles*, 154 Conn. 544, 547, 227 A.2d 251 (1967). "The master is not held on any theory that he personally interferes to cause the injury. It is simply on the ground of public policy, which requires that he shall be held responsible for the acts of those whom he employs, done in and about his business, even though such acts are directly in conflict with the orders which he has given them on the subject." (Internal quotation marks omitted.) *Stulginski* v. *Cizauskas*, 125 Conn. 293, 296, 5 A.2d 10 (1939). "[I]n order to hold an employer

liable for the intentional torts of his employee, the employee must be acting within the scope of his employment and in furtherance of the employer's business. *Cardona* v. *Valentin*, 160 Conn. 18, 22, 273 A.2d 697 (1970); *Pelletier* v. *Bilbiles*, supra, 547; *Antinozzi* v. *A. Vincent Pepe Co.*, 117 Conn. 11, 13, 166 A. 392 (1933); *Son* v. *Hartford Ice Cream Co.*, 102 Conn. 696, 699, 129 A. 778 (1925). But it must be the affairs of the principal, and not solely the affairs of the agent, which are being furthered in order for the doctrine to apply. *Mitchell* v. *Resto*, 157 Conn. 258, 262, 253 A.2d 25 (1968); *Wells* v. *Walker Bank & Trust Co.*, 590 P.2d 1261, 1264 (Utah 1979) (if employee's actions are not authorized by his employer and he is acting for his own interests and not in furtherance of his employer's business, employer cannot be held vicariously liable for employee's actions)." (Internal quotation marks omitted.) *A-G Foods, Inc.* v. *Pepperidge Farm, Inc.*, 216 Conn. 200, 208, 579 A.2d 69 (1990).

The jury found that Larsen had engaged in two of the four illegal practices that the plaintiff sought to attribute to Pearce Company under the doctrine of respondeat superior.[22] Specifically, the jury found that Larsen had engaged in unfair competition[23] (sixth count

---

[22] The complaint initially contained claims against Larsen alleging four separate illegal practices that could have been attributed to Pearce Company under the doctrine of respondeat superior. Count nine, which stated a claim against Larsen for conversion, was resolved by a directed verdict rendered against the plaintiff by the trial court, and the plaintiff has not appealed this decision. The portion of count eleven that stated in part a claim for unfair trade practices apparently has been abandoned by the plaintiff as a separate ground of liability. See footnote 26.

[23] "Unfair competition is now a generic name for a number of related torts involving improper interference with business prospects." W. Prosser & W. Keeton, Torts (5th Ed. 1984) § 130, p. 1013. In Connecticut, several cases alleging unfair competition have involved the use of similar trade names. See, e.g., *Shop-Rite Durable Supermarket, Inc.* v. *Mott's Shop Rite*, 173 Conn. 261, 377 A.2d 312 (1977); *Yale Co-operative Corp.* v. *Rogin*, 133 Conn. 563, 53 A.2d 383 (1947). It is settled, however, that this court also

of the complaint), and that he had interfered with the plaintiff's contractual relations[24] (eighth count of the complaint). In order to hold Pearce Company liable for the actions complained of in those two counts, the plaintiff needed only to show that Larsen was a servant of

recognizes under the umbrella term of "unfair competition" such causes of action as tortious interference with business expectancy; see *Sportsmen's Boating Corp.* v. *Hensley,* 192 Conn. 747, 754, 474 A.2d 780 (1984); and "unjustifiable interference with any [person's] right to pursue his [or her] lawful business or occupation." *Skene* v. *Carayanis,* 103 Conn. 708, 714, 131 A. 497 (1926). In these latter cases, a plaintiff must prove that the defendant was guilty of fraud, misrepresentation, intimidation or molestation, or that the defendant acted maliciously, in interfering with the plaintiff's business prospects. *Sportsmen's Boating Corp.* v. *Hensley,* supra, 754; *Skene* v. *Carayanis,* supra, 714; see *Kecko Piping Co.* v. *Monroe,* 172 Conn. 197, 201–202, 374 A.2d 179 (1977); *Busker* v. *United Illuminating Co.,* 156 Conn. 456, 461, 242 A.2d 708 (1968); *Goldman* v. *Feinberg,* 130 Conn. 671, 674, 37 A.2d 355 (1944). The trier of fact ordinarily may infer such intent from the defendant's conduct or acts in light of the circumstances of the particular case. *Waterbury Petroleum Products, Inc.* v. *Canaan Oil & Fuel Co.,* 193 Conn. 208, 216–17, 477 A.2d 988 (1984); *State* v. *Just,* 185 Conn. 339, 355, 441 A.2d 98 (1981); *Munn* v. *Scalera,* 181 Conn. 527, 530–31, 436 A.2d 18 (1980); *State* v. *Avcollie,* 178 Conn. 450, 466, 423 A.2d 118 (1979), cert. denied, 444 U.S. 1015, 100 S. Ct. 667, 62 L. Ed. 2d 645 (1980); *Bergen* v. *Bergen,* 177 Conn. 53, 57, 411 A.2d 22 (1979); *Heffernan* v. *New Britain Bank & Trust Co.,* 175 Conn. 8, 12, 392 A.2d 481 (1978). As Professor Keeton notes, however, the distinct trend among American courts is to move away from requiring plaintiffs to show malice or another form of specific intent. See W. Prosser & W. Keeton, supra, pp. 1014–15.

[24] The elements of a cause of action for tortious interference with contract rights are well settled. "This court has long recognized a cause of action for tortious interference with contract rights or other business relations. . . . Nevertheless, not every act that disturbs a contract or business expectancy is actionable. . . . [F]or a plaintiff successfully to prosecute such an action it must prove that the defendant's conduct was in fact tortious. This element may be satisfied by proof that the defendant was guilty of fraud, misrepresentation, intimidation or molestation . . . or that the defendant acted maliciously. . . . [A]n action for intentional interference with business relations . . . requires the plaintiff to plead and prove at least some improper motive or improper means. . . . [A] claim is made out [only] when interference resulting in injury to another is wrongful by some measure beyond the fact of the interference itself." (Citations omitted; internal quotation marks omitted.) *Robert S. Weiss & Associates, Inc.* v. *Wiederlight,* 208 Conn. 525, 535–36, 546 A.2d 216 (1988).

Pearce Company and that he had committed the acts within the scope of his employment and in furtherance of Pearce Company's business. *Pelletier* v. *Bilbiles*, supra, 154 Conn. 547. In other words, the only issue remaining to be proved was agency.

Nevertheless, even if we were to conclude on appeal that the trial court improperly directed a verdict for Pearce Company on the eleventh count of the plaintiff's complaint, we would be precluded from ordering a new trial. As noted above, any liability of Pearce Company under the eleventh count of the complaint was necessarily premised upon Larsen's liability to the plaintiff under the sixth and eighth counts of the complaint. On each of those counts, the jury returned a verdict for the plaintiff against Larsen in the amount of $1. It is well settled that when a plaintiff brings a claim against a principal based solely upon the tortious conduct of the agent, the plaintiff cannot recover any more compensatory damages from the principal than it could from the agent. 1 Restatement (Second), Agency § 217 B (2) (1958), and vol. 2, § 359 C (2); W. Seavey, Agency (1964) § 95 (D), p. 170. This is so because "there is a logical inconsistency in a small judgment against the agent and a large judgment against the principal, in cases in which the fault is wholly that of the agent." 1 Restatement (Second), supra, § 217 B, comment (c). Indeed, in such cases, it is error for the trier of fact to return a verdict for compensatory damages in a greater amount against the principal than against the agent. Id., § 217 B, comment (e). Therefore, if we were to remand this case to the trial court for a new trial against Pearce Company on the eleventh count of the complaint, and if the trier of fact were to find the issue of agency for the plaintiff, the verdict against Pearce Company would be limited to $1 in damages for vicarious liability under the sixth and eighth counts. In other words, the plain-

tiff would be entitled to recover only $2 in nominal compensatory damages against Pearce Company on the eleventh count of the complaint.[25]

"Nominal damages mean no damages. They exist only in name and not in amount." (Internal quotation marks omitted.) *Sessa* v. *Gigliotti*, 165 Conn. 620, 622, 345 A.2d 45 (1973); *Beattie* v. *New York, N. H. & H. R. Co.*, 84 Conn. 555, 559, 80 A. 709 (1911). Our case law makes clear that when our disposition of a claim on appeal entitles a party to a trial in which only nominal damages may be awarded, we will not remand the case for a new trial. *Sessa* v. *Gigliotti*, supra, 622; *Went* v. *Schmidt*, 117 Conn. 257, 259–60, 167 A. 721 (1933); *Cheshire Brass Co.* v. *Wilson*, 86 Conn. 551, 558–59, 86 A. 26 (1913); *Beattie* v. *New York, N. H. & H. R. Co.*, supra, 559. Accordingly, the plaintiff's appeal on this count is dismissed.

## B

In the twelfth count of its complaint, the plaintiff alleged that Pearce Company, independent of any vicarious liability, had itself committed the business related torts of interference with contractual relations and unfair competition.[26] It is a general rule of substantive law that corporations, like individuals, are liable for their torts. *Isaacson* v. *Husson College*, 297 A.2d 98, 102 (Me. 1972). This liability arises apart from, and is distinguishable from, liability under the theory of respondeat superior. *Schoedler* v. *Motometer Gauge &*

[25] The plaintiff would not be entitled to seek punitive damages under this count because it failed to preserve that claim. See part IV of this opinion.

[26] In its complaint, the plaintiff alleged that Pearce Company had committed "unfair competition, unfair trade practices, and interference with contractual relations . . . ." In its brief before this court, however, the plaintiff addressed "unfair competition and trade practices" as one cause of action, and did not provide a separate analysis of any tort identified as "unfair trade practices." Moreover, the cases cited by the plaintiff in this section of its brief referred only to the tort of unfair competition. Accordingly, we limit our discussion to the common law tort of unfair competition.

*Equipment Corp.*, 134 Ohio St. 78, 83, 15 N.E.2d 958 (1938); *American Ins. Group* v. *McCowin*, 7 Ohio App. 2d 62, 65, 218 N.E.2d 746 (1966). As we indicated previously, the theory of respondeat superior attaches liability to a principal merely because the agent committed a tort while acting within the scope of his employment. "It refers to those acts which are so closely connected with what the servant is employed to do, and so fairly and reasonably incidental to it, that they may be regarded as methods, even though quite improper ones, of carrying out the objectives of the employment." W. Prosser & W. Keeton, Torts (5th Ed. 1984) § 70, p. 502. A principal may be directly liable, however, for the acts of its agents that it authorizes or ratifies. Id., pp. 501–502; 1 Restatement (Second), supra, § 212 (principal liable for authorized conduct), and § 218 (principal liable for ratified conduct). "In order to find that a corporation has committed an intentional act, a court or jury must find that the corporation committed, directed or ratified the intentional act." *Cathay Mortuary (Wah Sang)* v. *United Pacific Ins. Co.*, 582 F. Sup. 650, 653 (N.D. Cal. 1984).

In order to hold Pearce Company directly liable for tortious conduct, therefore, the plaintiff needed to prove that Pearce Company, as a principal, had authorized or ratified the specified tortious acts. It is well settled, however, that a corporation is a distinct legal entity that can act only through its agents. *Lieberman* v. *Reliable Refuse Co.*, 212 Conn. 661, 673, 563 A.2d 1013 (1989). In order for direct liability to attach to Pearce Company, therefore, agents of the corporation, acting on behalf of the corporation, must have authorized or ratified the wrongful acts. In other words, for example, the plaintiff in this case needed to prove that Barbara Pearce, acting as the president of and on behalf of Pearce Company, authorized or ratified actions constituting the substantive torts of interfer-

ence with contractual relations[27] and unfair competition.[28]

Just as we were precluded from ordering a new trial on the eleventh count of the complaint, however, we also are precluded from ordering a new trial on this count. Each and every one of the acts alleged under the twelfth count of the complaint also was included in the sixth and eighth counts, which alleged that Larsen individually had committed the torts of unfair competition and interference with contractual relations. The jury determined, under the sixth and eighth counts, that these acts had caused the plaintiff to suffer only nominal damages. It is settled that "[w]hen an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim." 1 Restatement (Second), Judgments § 27 (1982); see *Crochiere* v. *Board of Education*, 227 Conn. 333, 343, 630 A.2d 1027 (1993); *Scalzo* v. *Danbury*, 224 Conn. 124, 128, 617 A.2d 440 (1992). With certain exceptions, none of which are applicable in this case, a party also is precluded from relitigating these issues "with another person." 1 Restatement (Second), Judgments § 29 (1982). If we were to remand the twelfth count to the trial court for a new trial against Pearce Company, therefore, the previous jury's finding that these acts had caused the plaintiff to suffer only nominal damages would be controlling. As we stated previously, we will not remand a count for a new trial in which only nominal compensatory damages can result.[29]

[27] See footnote 24.

[28] See footnote 23.

[29] The plaintiff would not be entitled to seek punitive damages under this count because it failed to preserve that claim. See part IV of this opinion.

## C

In the thirteenth count of its complaint, the plaintiff alleged that Pearce Company had engaged in "deceptive and unfair conduct" and thereby had violated CUTPA. It is clear that "CUTPA has come to embrace a much broader range of business conduct than does the common law tort action." *Sportsmen's Boating Corp.* v. *Hensley*, 192 Conn. 747, 756, 474 A.2d 780 (1984). "While liability in tort is imposed only if the defendant maliciously or deliberately interfered with a competitor's business expectancies, CUTPA liability is premised on a finding that the defendant engaged in unfair competition and unfair or deceptive trade practices." Id., 755.

In determining whether the defendant has engaged in such activity and thereby violated CUTPA, courts must apply the so-called "cigarette rule," which asks "(1) [w]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—whether, in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers [competitors or other businessmen]." (Internal quotation marks omitted.) *Jacobs* v. *Healey Ford-Subaru, Inc.*, 231 Conn. 707, 725, 652 A.2d 496 (1995); *Sanghavi* v. *Paul Revere Life Ins. Co.*, 214 Conn. 303, 311–12, 572 A.2d 307 (1990); *Sportsmen's Boating Corp.* v. *Hensley*, supra, 192 Conn. 756.

We conclude that the plaintiff introduced sufficient evidence to allow the jury to conclude that Barbara Pearce, acting on behalf of the corporation, had authorized or ratified the actions of Larsen and, therefore,

that Pearce Company had violated the first and second of these tests. It is undisputed that Barbara Pearce was the president of Pearce Company at the time of these incidents and was acting on behalf of the corporation. See generally *Czarnecki* v. *Plastics Liquidating Co.*, 179 Conn. 261, 267, 425 A.2d 1289 (1979); *Cohen* v. *Holloways', Inc.*, 158 Conn. 395, 407, 260 A.2d 573 (1969). Moreover, the jury could have concluded, on the basis of the evidence presented, that Barbara Pearce had authorized or ratified Larsen's actions with respect to the plaintiff. Larsen testified that he had gone to Pearce Company's office on February 1, 1989, to inquire whether Pearce Company might be interested in purchasing or investing in the plaintiff. Barbara Pearce informed Larsen that Pearce Company was not interested in buying or investing in the plaintiff, but she proceeded to offer him a position as commercial and industrial sales manager. She further informed him that she would be happy to speak with any other employees of the plaintiff and might offer them jobs. She accepted from Larsen a list of the brokers working for the plaintiff, and she discussed their backgrounds with him. Larsen told his coworkers that " 'she would be happy to interview them.' "

Barbara Pearce met with Larsen, who was still the president of her competitor, three more times during the month of February. During the course of these meetings, they discussed at least one property that was listed with the plaintiff. On March 6, while still in the employment of the plaintiff, Larsen signed a listing agreement as an agent of Pearce Company and also notified the New Haven board of realtors that he and other brokers of the plaintiff would become affiliated with Pearce Company. He also sent a letter to a client of the plaintiff instructing the client how to withdraw its listing from the plaintiff's computer system and to reenter it immediately under the Pearce Company

computer system. The change of address form prepared by Larsen forwarded all mail of the plaintiff to the office of Pearce Company.

Furthermore, before mailing the March 6 letter to clients of the plaintiff, Larsen testified that he had allowed Barbara Pearce to examine a draft and to offer comments about it. Larsen deleted a portion of the draft, which referred to a "merger," after Barbara Pearce took exception to it. This was the only change Larsen made before mailing the letter. Barbara Pearce did not ask Larsen to remove references in the letter to Pearce Company. On the contrary, she allowed, if not encouraged, Larsen to include extremely favorable references to Pearce Company in the letter. On the basis of this evidence, the jury reasonably could have inferred that Barbara Pearce, the president of Pearce Company, had authorized or ratified the actions of Larsen, which the jury concluded had violated CUTPA.[30] The trial court, therefore, should not have directed a verdict for Pearce Company on the thirteenth count of the complaint.

Unlike our disposition of the eleventh and twelfth counts, however, we conclude that this count must be remanded to the trial court for a new trial. We reach this conclusion because "[t]he plaintiff who establishes CUTPA liability has access to a remedy far more comprehensive than the simple damages recoverable under common law." *Hinchliffe* v. *American Motors Corp.*, supra, 184 Conn. 617. This remedy is not limited to mere compensatory damages. *Gill* v. *Petrazzuoli Bros., Inc.*, 10 Conn. App. 22, 34–35, 521 A.2d 212 (1987). Rather, under CUTPA, a plaintiff is entitled to have the trial court consider awarding both punitive damages; General Statutes § 42-110g (a); and attorney's fees. General Statutes § 42-110g (d); see *Hinchliffe* v.

---

[30] See part I B of this opinion; see also footnotes 23 and 24.

*American Motors Corp.*, supra, 617–18. This count, therefore, must be remanded for a new trial.

### III

The plaintiff next claims that the trial court, after receiving the jury's summary of the verdict in the amount of "$6,169 plus plaintiff's attorney's fees," improperly ordered the jury to strike the words "plus plaintiff's attorney's fees" from this form.

The following facts are relevant to our disposition of this claim. The parties stipulated at the commencement of the trial that the court, rather than the jury, would determine after the jury returned its verdict whether the plaintiff was entitled to recover attorney's fees and, if so, the amount of these fees. Accordingly, the court did not instruct the jury on these damages and the plaintiff did not request such a charge.

At the conclusion of the trial court's instructions to the jury, the court provided the jury with a document entitled "Jury Instructions." These "instructions" consisted of seventeen pages of detailed, instructive interrogatories, covering each of the ten counts against Larsen,[31] and were designed to lead the jury through the complex maze of the ten counts and their essential elements.[32] After the jury reached the final interrogatory for each count, it was directed to insert the amount of damages, if any, to be awarded to the plaintiff under that count.[33] The jury then progressed through the ten

---

[31] The court had directed a verdict for Pearce Company and, therefore, the interrogatories did not address the liability of that defendant.

[32] See generally R. Berdon, "Instructive Interrogatories: Helping the Civil Jury To Understand," 55 Conn. B.J. 179 (1981).

[33] For example, the interrogatory for the first count of the complaint, which had alleged libel, provided as follows (answers by the jury are indicated by an "X" or a dollar figure):

"FIRST COUNT

1. Did the plaintiff Larsen Chelsey Realty Company prove, by a fair preponderance of the evidence, that the statements made in the letter of March 6,

counts, until it had completed all of the interrogatories and filled in all of the damage awards. The trial court also supplied the jury with a "plaintiff's verdict" form.

---

1989, Plaintiff's Exhibit T, were understood by the recipients of the letter to prejudice Larsen Chelsey Realty Company in the conduct of its business or to deter others from dealing with it?

    __X__ Yes
    _____ No

If the answer to #1 is yes, proceed to the next question.

If the answer to #1 is no, you should skip questions 2—10 below, award no damages to the Plaintiff on the First Count, and proceed to question 11.

2. Did the plaintiff Larsen Chelsey Realty Company prove, by a fair preponderance of the evidence, that the statements made in the letter of March 6, 1989 were false?

    __X__ Yes
    _____ No

If the answer to #2 is yes, proceed to the next question.

If the answer to #2 is no, you should skip questions 3—10 below, award no damages to the Plaintiff on the First Count, and proceed to question 11.

3. Did the plaintiff Larsen Chelsey Realty Company prove, by a fair preponderance of the evidence, that the defendant S. Craig Larsen either intentionally misstated facts or negligently misstated facts in making the statements contained in the letter of March 6, 1989?

    __X__ Yes
    _____ No

If the answer to #3 is yes, proceed to the next question.

If the answer to #3 is no, you should skip questions 4—10 below, award no damages to the Plaintiff on the First Count, and proceed to question 11.

4. Did the plaintiff Larsen Chelsey Realty Company prove, by a fair preponderance of the evidence, that the statements made in the letter of March 6, 1989 were a substantial factor in causing some or all of the injuries claimed by the plaintiff?

    __X__ Yes
    _____ No

If the answer to #4 is yes, proceed to the next question.

If the answer to #4 is no, you should skip questions 5—10 below, award no damages to the Plaintiff on the First Count, and proceed to question 11.

5. Did the defendant S. Craig Larsen prove, by a fair preponderance of the evidence, that the statements made in the letter of March 6, 1989 were substantially true?

    _____ Yes
    __X__ No

The completed interrogatories in the document entitled "Jury Instructions" revealed that the jury had

If the answer to #5 is yes, you should skip questions 6—10 below, award no damages to the Plaintiff on the First Count, and proceed to question 11.

If the answer to #5 is no, proceed to the next question.

6. Did the defendant S. Craig Larsen prove, by a fair preponderance of the evidence, that the statements contained in the letter of March 6, 1989 were made with the consent of the plaintiff Larsen Chelsey Realty Company?

     _____ Yes
      X  No

If the answer to #6 is yes, you should skip questions 7—10 below, award no damages to the Plaintiff on the First Count, and proceed to question 11.

If the answer to #6 is no, proceed to the next question.

7. Did the defendant S. Craig Larsen prove, by a fair preponderance of the evidence, that the statements made in the letter of March 6, 1989, even if they could be construed to convey a defamatory meaning, were reasonably susceptible to more than one interpretation and one such interpretation was not defamatory?

     _____ Yes
      X  No

If the answer to #7 is yes, you should skip questions 8—10 below, award no damages to the Plaintiff on the First Count, and proceed to question 11.

If the answer to #7 is no, proceed to the next question.

8. Has the Plaintiff proved, by a fair preponderance of the evidence, that the Defendant S. Craig Larsen made the statements contained in the letter of March 6, 1989 with malice as that term was defined in the judge's instructions?

      X  Yes
     _____ No

If the answer to #8 is yes, proceed to the next question.

If the answer to #8 is no, skip question 9 and proceed to question #10.

9. If you have answered questions 1—8 above and, as a result of your answers, have been instructed to proceed to this question, state, as a dollar figure, the Plaintiff's 'general damages' (as that term was defined by the judge), if any, which were caused in substantial part, by the publication of the statements contained [in] the letter of March 6, 1989. This dollar figure should be adjusted as noted in the next paragraph.

Your damages should reflect a reduction, if any, to the extent that you find that the Defendant has proved by a fair preponderance of the evidence that the Plaintiff failed to mitigate damages as that [term] has been defined by the judge in his instructions.

      $165.00 

Proceed to the next question.

reached the following verdicts. On the first count, the jury found that the plaintiff had proved libel and awarded $165 in damages. On the second count, the jury failed to find the necessary elements for slander. On the third count, the jury failed to find the necessary elements for libel. The court had directed a verdict with respect to the fourth count and the jury was not required to answer. On the fifth count, the jury found that the plaintiff had proved breach of a fiduciary duty and awarded $6000 in damages. On the sixth count, the jury found that Larsen had engaged in unfair competition and awarded $1 in damages. On the seventh count, the jury found that Larsen had engaged in a theft of corporate opportunity and awarded $1 in damages. On the eighth count, the jury found that Larsen had interfered with the plaintiff's contractual relations and awarded $1 in damages. The court had directed a verdict with respect to the ninth count and the jury was not required to answer. Finally, on the tenth count, the jury found that Larsen had violated CUTPA and awarded $1 in damages.

When the jury returned the "Jury Instructions," it also returned the plaintiff's verdict form, on which the jury had written that the plaintiff was to recover from Larsen damages in the amount of "$6,169 plus plain-

10. If you have answered either 1—8 above or 1—9 above and, as a result of your answers, have been instructed to proceed to this question, state, as a dollar figure, those *actual damages*, if any, which you find the plaintiff Larsen Chelsey Realty Company proved, by a fair preponderance of the evidence, would reasonably compensate it for the injuries caused, in substantial part, by the publication of the statements contained [in] the letter of March 6, 1989. This damage figure should be adjusted as noted in the next paragraph.

Your damages should reflect a reduction, if any, to the extent that you find that the Defendant has proved by a fair preponderance of the evidence that the Plaintiff failed to mitigate damages as that term has been defined by the judge in his instructions.

Do not include in your answer any damages awarded under question 9 above.

$ –0–"

tiff's attorney's fees." The plaintiff conceded before the trial court that the "attorney's fees" the jury had announced must have meant attorney's fees under CUTPA, and the plaintiff further conceded that the parties had agreed to allow the court to determine this issue. The court therefore ordered the jury to retire to the jury room and delete the words "plus plaintiff's attorney's fees" from the plaintiff's verdict form.[34] The jury did so, returning a few moments later with the same form, but with a line drawn through the words "plus plaintiff's attorney's fees." The plaintiff timely objected to this procedure, arguing that the court should have informed the jurors that they could not award attorney's fees and, therefore, that they should reconsider their verdict.[35]

The plaintiff now argues that the trial court committed reversible error when it ordered the jurors to amend their verdict by deleting the words "plus plaintiff's attorney's fees." The plaintiff argues that

[34] The court instructed the jury as follows: "Please be seated, ladies and gentlemen . . . . Counsel and I have gone through the interrogatories, and everything would appear to coordinate. There is just one matter I must take up with you, and that has to do with the plaintiff's verdict, and the award . . . of attorney's fees. The question of whether or not a plaintiff is . . . entitled to attorney's fees and the amount of those fees, if they're found to be deserving, is an area for the Court, and for the Court alone. And, therefore, I ask that you just amend your verdict, by removing that phrase. And rather than waste a lot of time, by retyping everything and starting all over again, if the foreman would just delete that, with pen and ink, and, then, initial the change, we could . . . we'll let you retire and do that. And, then, we'll collect it. Do you want . . . to retire to—I think you ought to retire to do it. . . . It might—be better if you retired and did it . . . together."

[35] The plaintiff's counsel took exception to the procedure as follows: "I'd like to note my exception to the charge. I believe the charge should have instructed them to go back, to be advised that they could not award legal fees, that their award had to be in a dollar sum certain, and that, in deleting the statement [of 'plus-plaintiff's attorney's fees'], together with attorney's fees, they could reconsider the award, and reconsider the verdict and the amount awarded, in view of that amendment."

*Gurland* v. *D'Adamo*, 41 Conn. Sup. 407, 579 A.2d 144 (1990), sets out the proper procedure a court should follow when faced with an improper verdict, and that the trial court in this case improperly failed to follow that precedent.

In *Gurland*, after several days of deliberation, the jury rendered a verdict for the plaintiff against all defendants for the sum of $20,000, " 'plus court costs and legal fees.' " Id., 407. The court, after instructing the jurors that attorney's fees were not an element of damages that they could consider, furnished them with another verdict form and instructed them to reconsider the verdict. Id. The jury returned within fifteen minutes with a verdict for the plaintiffs for $50,000, which the court accepted. Id., 408. The court thereafter denied the defendants' motion for a remittitur, concluding that it had followed proper procedure. After determining that Connecticut statutes and rules of practice strictly circumscribe the options available to the court when a jury returns a seemingly improper verdict,[36] the trial court concluded that it could not instruct jurors on how to amend or correct their verdict form. The trial court held that, "[w]hen returning the jury to reconsider their verdict, it is proper for the court to inform them of the reason why they are being returned. *Ryan* v. *Scanlon*, 117 Conn. 428, 436, 168 A. 17 (1933). It is, however, improper for the court to direct them to change the

---

[36] General Statutes § 52-223 provides: "The court may, if it judges the jury has mistaken the evidence in the action and has brought in a verdict contrary to the evidence, or has brought in a verdict contrary to the direction of the court in a matter of law, return them to a second consideration, and for the same reason may return them to a third consideration. The jury shall not be returned for further consideration after a third consideration."

Practice Book § 311 provides: "The court may, if it determines that the jury have mistaken the evidence in the cause and have brought in a verdict contrary to it, or have brought in a verdict contrary to the direction of the court in a matter of law, return them to a second consideration, and for like reason may return them to a third consideration, and no more."

amount of their verdict. [W]hether they should change the amount or adhere to the verdict as rendered was a question solely for their determination. *Cruz* v. *Drezek*, 175 Conn. 230, 242, 397 A.2d 1335 (1978)." (Internal quotation marks omitted.) *Gurland* v. *D'Adamo*, supra, 41 Conn. Sup. 408.

We need not decide whether the trial court should have returned the jury under the procedure outlined in *Gurland*, because the court in this case had provided the jury with detailed, instructive interrogatories that allowed the jury to insert the damages it found under each count as a sum certain. In effect, the jury's monetary answer on damages in the interrogatories to each count of the complaint was in itself a verdict, and the verdict form that the jury returned to the court merely constituted a summary of those individual verdicts. Indeed, the final instruction on the interrogatories directed the jury to "place the total of all damages, if any, shown in response to [the previous damages questions] on the line below. *This will conclude your deliberations* as to S. Craig Larsen."[37] (Emphasis added.) This directive informed the jury that by entering the sum of the damages it had awarded under the interrogatories, the jury had completed its deliberations. The mere task of carrying forward the total of the individual verdict amounts into the "verdict form," therefore, was ministerial in nature. The trial court, in fact, explicitly had instructed the jury prior to deliberations that its only duty in filling out the plaintiff's verdict form was to "carry those figures forward, insert them into the verdict, and you will have tied the two together."

[37] The final question on the jury instructions provided in its entirety: "42. As to the defendant S. Craig Larsen, place the total of all damages, if any, shown in response to questions 9, 10, 18, 26, 29, 32, 35, 38, 41 on the line below. This will conclude your deliberations as to S. Craig Larsen." In response to this question, the jury foreperson wrote in the dollar amount "$6,169.00," the sum total of the damages the jury had awarded on all counts in favor of the plaintiff.

In none of the verdicts set forth in the interrogatories, which totaled $6169, did the jury attempt to award attorney's fees to the plaintiff. The language in the verdict summary, that Larsen was to pay that sum "plus plaintiff's attorney's fees," could therefore be regarded as mere surplusage. See *Kilduff* v. *Kalinowski*, 136 Conn. 405, 71 A.2d 593 (1950); *Oneker* v. *Ligget Drug Co.*, 124 Conn. 83, 197 A.2d 887 (1938). The trial court, therefore, acted properly in ordering the jury to strike those words from its summary form.

## IV

The plaintiff next claims that the trial court improperly refused to allow it to recover common law punitive damages from Larsen under the intentional tort counts.[38] After the trial, the plaintiff asked the court to award common law punitive damages on the tort counts, arguing that the jury's explicit finding of malice by Larsen in writing and mailing the March 6 letter[39] required the court to award such damages. The court refused.[40] The plaintiff now claims that the trial court's decision was improper. We disagree.

It is well settled, as the trial court noted, that it is the responsibility of the trier of fact to award common law punitive damages for intentional torts. *Kenny* v. *Civil Service Commission*, 197 Conn. 270, 277, 496 A.2d 956 (1985); *Gionfriddo* v. *Avis Rent A Car System, Inc.*, 192 Conn. 280, 295, 472 A.2d 306 (1984); *Vogel* v. *Sylvester*, 148 Conn. 666, 673, 174 A.2d 122 (1961); *Hanna*

---

[38] Under Connecticut common law, the term "punitive damages" refers to the expenses of bringing the legal action, including attorney's fees, less taxable costs. *Venturi* v. *Savitt, Inc.*, 191 Conn. 588, 592, 468 A.2d 933 (1983); *Chykirda* v. *Yanush*, 131 Conn. 565, 568, 41 A.2d 449 (1945).

[39] The jury made this finding in response to question eight of the instructive interrogatory for count one. See footnote 33.

[40] Although the parties had stipulated that the court, rather than the jury, would rule on the issue of punitive damages, this stipulation was limited to punitive damages available under CUTPA. See footnote 21.

v. *Sweeney*, 78 Conn. 492, 494, 62 A. 785 (1906); *Bennett* v. *Gibbons*, 55 Conn. 450, 452, 12 A. 99 (1887). This case was tried to a jury. The jury, as the trier of fact, and not the trial court, would ordinarily have had the authority to award punitive damages. The plaintiff informed the court prior to trial that it was seeking punitive damages only on the CUTPA counts, however, and the plaintiff did not request the court to charge the jury on the issue of common law punitive damages. Furthermore, when the court did not deliver such an instruction, the plaintiff did not take exception to the charge as given. See *Berry* v. *Loiseau*, 223 Conn. 786, 814, 614 A.2d 414 (1992) ("[Practice Book § 315] provides that this court is not bound to review claims of error in jury instructions if the party raising the claim did not either submit to the trial court a written request to charge or promptly except to the charge after it was delivered"). The trial court, therefore, acted properly in denying the plaintiff's posttrial motion for common law punitive damages on the tort counts.

V

The plaintiff next argues that the trial court made improper rulings on evidence. First, the plaintiff argues that the court improperly excluded several financial documents from evidence. Second, the plaintiff argues that, although the court properly allowed the March 6 letter into evidence against Larsen, it improperly refused to allow the letter into evidence against Pearce Company. We consider these arguments in turn.

A

The plaintiff first contends that the trial court improperly excluded from evidence several documents, including: (1) a financial report entitled "Analysis: Larsen Chelsey Financial Report"; (2) three handwritten summaries of revenue projections; and (3) a summary of the plaintiff's exclusive listings.

The plaintiff's business adviser, Irwin Ganson, had prepared the financial report in May or June, 1988, as part of a bank application for a line of credit for the plaintiff. The report consisted of a narrative about the company and included projections for the plaintiff's income for the second half of 1988 and all of 1989.

Larsen had prepared the handwritten revenue projections at different times during 1988. He prepared the first projection in May, 1988. That projection was the basis for the revenue projections Ganson later included in his financial report. Larsen prepared the second and third projections in August, 1988. The third projection, in fact, was calculated by adding up the figures contained in the first two projections. Each projection contained information about the properties the plaintiff had listed, including the expiration date of the listing and the commission the plaintiff would earn if it found a buyer or tenant for the listed properties.

Finally, Larsen had prepared a summary of the plaintiff's exclusive listings in either December, 1988, or January, 1989. The summary included the addresses of the properties which were listed exclusively with the plaintiff and the "gross commission potential" for each.

The plaintiff argued that these documents tended to show the value of the plaintiff's business and its "opportunity value," and therefore were material to the issue of damages the plaintiff suffered as a result of the defendants' actions in March, 1989. The court, however, rejected the financial report and the handwritten revenue projections as irrelevant. The court also refused to admit the summary of exclusive listings, concluding that the plaintiff had failed to provide a proper foundation for the document. The court, however, expressly noted that "I'm not closing the door on your renewing this" by providing the proper foundation through another witness, such as the plaintiff's expert

on business valuation. Indeed, the trial court later allowed this document into evidence on the condition that the plaintiff redact the last column showing "gross commission potential." The plaintiff did not object to the condition, agreeing that "[i]f [the court] want[s] to eliminate the last column, I think that's okay, too."

On appeal, the plaintiff argues that the court improperly refused to admit the documents. First, it contends that all of the documents were relevant to the issue of damages. Second, it argues that the documents prepared by Larsen "were offered to contradict his testimony" and as prior inconsistent statements, which may be used not only to impeach a witness but also as substantive evidence of the matters contained therein. See *State* v. *Whelan*, 200 Conn. 743, 746–47, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986).

The plaintiff offered all of the documents in question to prove the value of its business immediately prior to March 10, 1989, when it claims that the actions of the defendants caused the business to become valueless. The trial court needed to determine as a threshold issue, therefore, whether the documents were relevant to the determination of damages.

"The rules for determining the admissibility of evidence are well settled. The trial court has broad discretion to determine both the relevancy and remoteness of evidence. . . . Only upon a showing of a clear abuse of discretion will this court set aside on appeal rulings on evidentiary matters. . . . In considering the relevancy of evidence, we ask whether it tends to establish the existence of a material fact or to corroborate other direct evidence in the case. . . . Because there is no precise and universal test of relevancy, however, the question must ultimately be addressed on a case-by-case basis in accordance with the teachings of reason

and judicial experience." (Citations omitted; internal quotation marks omitted.) *Dunham* v. *Dunham*, 204 Conn. 303, 324, 528 A.2d 1123 (1987).

The trial court was justified in concluding that none of the documents proffered tended to establish the value of the plaintiff's business immediately prior to March 10, 1989. All of the documents were prepared several months before the events at issue here. The financial report was prepared for the purpose of obtaining a line of credit, and the trial court recognized that "it would be couched in very optimistic phrases." The projections of revenues were prepared between seven and ten months before the events in question. Moreover, the projections included commissions calculated with reference to sales or leases for several properties whose listings with the plaintiff would have expired prior to March, 1989. For all these reasons, it was well within the broad discretion of the trial court to conclude that the financial report and the revenue projections were not admissible for the purpose of determining the value of the plaintiff's business in March, 1989.

Similarly, we conclude that the trial court properly excluded the summary of the plaintiff's exclusive listings, prepared at least two months before the incidents at issue here. The plaintiff attempted to introduce the summary while its president, Zaniewski, was on the witness stand. He testified that he did not know if any of the financial premises upon which the document's "gross commission potential" was based had ever occurred. Although the trial court acknowledged that the document was "not so remote" in time, the court declined to allow it into evidence through Zaniewski, concluding that the plaintiff had failed to furnish the proper foundation for admitting the document. The court, however, later admitted the document into evidence through another witness, on the condition that the column showing the "gross commission potential"

be redacted. As noted earlier, the plaintiff not only failed to object to this condition, but expressly consented to it.

Accordingly, we conclude that the trial court did not abuse its discretion in excluding the documents from evidence as irrelevant and in admitting the summary of the plaintiff's exclusive listings with the redaction.[41]

The plaintiff's second argument for the admissibility of the documents—that the documents prepared by Larsen "were offered to contradict his testimony" and as prior inconsistent statements—is equally without merit.

"The accepted foundation for the introduction of such statements is first to ask the witness on cross-examination whether he made the alleged statement, alerting him to the time and place. . . . Inconsistent statements may be shown only *after* a witness has testified and may not be introduced in anticipation of contradiction or to lay the basis for later cross-examination. *State* v. *Zdanis*, 173 Conn. 189, 195–196, 377 A.2d 275 (1977); *Adams* v. *The Herald Publishing Co.*, [82 Conn. 448, 452–53, 74 A. 755 (1909)]." (Citations omitted; emphasis in original.) C. Tait & J. LaPlante, Connecticut Evidence (2d Ed. 1988) § 7.24.3 (b), p. 209. As the trial court concluded, the plaintiff did not lay a proper foundation to use any of the documents as prior inconsistent statements of Larsen.

The plaintiff attempted to introduce the financial report into evidence before Larsen ever testified and did not attempt to impeach him with its contents while he was on the stand. Thus, the plaintiff failed to lay

---

[41] The plaintiff also argues that all of the documents were business records and that all of the documents prepared by Larsen qualified as admissions of a party opponent. Because we have concluded that the trial court did not abuse its discretion in determining that the documents were irrelevant to the plaintiff's damage claim, we need not reach the hearsay issues.

the proper foundation for this document as a prior inconsistent statement of Larsen.

The plaintiff attempted to introduce the earlier two revenue projections into evidence before Larsen testified and did not attempt to impeach him with their contents while he was on the stand. The plaintiff did attempt to introduce all three projections into evidence after Larsen had testified. The plaintiff did not, however, inform the court that it was offering them as prior inconsistent statements of Larsen or to contradict his testimony. Instead, the plaintiff referred only to their value as proving its damages.

The summary of exclusive listings was the only document that the plaintiff moved to introduce during Larsen's testimony. As noted previously, the court allowed it into evidence on the condition that the plaintiff redact the last column showing "gross commission potential," and the plaintiff agreed to this deletion.

Against this procedural background, the plaintiff's claim on appeal that the trial court improperly refused to allow the documents as prior inconsistent statements of Larsen is without merit.

## B

The plaintiff's final claim of evidentiary error involves the trial court's decision to admit the March 6 letter as evidence against Larsen but not against Pearce Company. The plaintiff attached the letter to its complaint pursuant to Practice Book § 141.[42] The plaintiff argues

---

[42] Practice Book § 141 provides in relevant part: "Where the plaintiff desires to make a copy of any document a part of his complaint, he may, without reciting it or annexing it, refer to it as Exhibit A, B, C, etc., as fully as if he had set it out at length; but in such case he shall serve a copy of such exhibit or exhibits on each other party to the action forthwith upon receipt of notice of the appearance of such party and file the original or a copy of such exhibit or exhibits in court with proof of service on each appearing party. Where such copy or copies exceed in all two pages in length,

that the letter, because it was attached to the complaint, constitutes a "judicial admission" by Pearce Company and that the trial court therefore improperly refused to admit it as evidence against Pearce Company. We disagree.

The plaintiff correctly argues that our rules of practice provide that "[e]very material allegation in any pleading which is not denied by the adverse party shall be deemed to be admitted, unless he avers that he has not any knowledge or information thereof sufficient to form a belief." Practice Book § 129. The plaintiff, however, disregards the fact that Pearce Company, in its amended answer to the complaint, expressly stated that it denied or had no knowledge or belief about any of the allegations in the complaint in regard to the March 6 letter. Accordingly, we affirm the trial court's decision not to admit the letter against Pearce Company on the grounds proffered by the plaintiff.[43]

## VI

Finally, the plaintiff claims that the trial court improperly charged the jury. At a charging conference the day prior to delivering its instructions, the court informed counsel for the parties that it would instruct the jury that "the plaintiff cannot recover general damages, but would be restricted in any recovery to those damages specifically alleged and proved." In delivering the charge, however, the court instructed the jury that it could award "such general damages as you deem

if the plaintiff annexes them to, or incorporates them in, his complaint at full length, he shall not be allowed in his costs for such part of the fees of the officer for copies of such complaint left in service, as are chargeable for copying such instrument or instruments, except to the extent of two pages."

[43] During the retrial of the plaintiff's action against Pearce Company on the thirteenth count of the complaint, however, the trial court may determine that some or all of these documents may be relevant and admissible evidence against Pearce Company.

fair and reasonable." Although the plaintiff noted at trial that the court "seemed to change your mind overnight," it only objected to the charge on the ground that the court had not defined "general damages." The court, in response to this objection, recharged the jury by furnishing a definition of "general damages" as "damages that . . . don't, necessarily, have to be, specifically, proven." The plaintiff did not take exception to this second charge.

The plaintiff, while acknowledging that the charge given was more favorable to it than the charge originally proposed, nevertheless claims that the court's decision to alter the charge "without any prior warning to counsel . . . was simply substantially unfair." The plaintiff contends that, in its closing argument, it "spent an hour reinforcing a theory requiring some calculation and the judge spent fifteen seconds, the time it takes to read four lines of text, telling [the jury that it] could award more, without regard to the actual damages."

The plaintiff, however, has failed to preserve this claim for appeal. Our rules of practice provide that we are not bound to consider claims of error unless they are distinctly raised at trial. See Practice Book §§ 4185, 315;[44] *Berry* v. *Loiseau*, supra, 223 Conn. 813. In this case, the plaintiff objected only to the court's failure to define "general damages" in its initial jury charge, and the court responded to that objection by recharg-

---

[44] Practice Book § 4185 provides in pertinent part: "The court on appeal shall not be bound to consider a claim unless it was distinctly raised at the trial or arose subsequent to the trial."

Practice Book § 315 provides: "The supreme court shall not be bound to consider error as to the giving of, or the failure to give, an instruction unless the matter is covered by a written request to charge or exception has been taken by the party appealing immediately after the charge is delivered. Counsel taking the exception shall state distinctly the matter objected to and the ground of objection. Upon request, opportunity shall be given to present the exception out of the hearing of the jury."

ing the jury in this regard. The plaintiff made no further objections to the charge, and failed to indicate in any other manner that it was concerned with the new charge the court had delivered. Because the plaintiff failed to preserve this claim of error properly, we cannot resurrect it on appeal.

## VII

We affirm the actions of the trial court: (1) in ordering the jury foreperson to delete the words "plus plaintiff's attorney's fees" from the verdict form; (2) in refusing to award the plaintiff common law punitive damages from Larsen on the tort counts; and (3) in its rulings on evidentiary issues. In addition, we reject the plaintiff's claims that the trial court improperly: (1) directed a verdict for Pearce Company on the eleventh count of the complaint, which alleged that Pearce Company was vicariously liable for certain of Larsen's tortious acts under a theory of respondeat superior; (2) directed a verdict for Pearce Company on the twelfth count of the complaint, which alleged that Pearce Company had committed the common law torts of unfair competition and interference with contractual relations; and (3) prejudiced the plaintiff by charging the jury that it could award general damages.

We reverse the trial court insofar as it: (1) set aside the jury verdict for the plaintiff against Larsen on the tenth count of the complaint, which alleged violations of CUTPA; and (2) directed a verdict for Pearce Company on the thirteenth count of the complaint, which alleged that Pearce Company had violated CUTPA.

On remand, the trial court should: (1) articulate its grounds for setting aside the jury verdict for the plaintiff on the first count of the complaint, which alleged libel;[45] (2) reinstate the jury verdict for the plaintiff

---

[45] If the plaintiff and Larsen are able to resolve their dispute on this matter, an articulation shall not be required. Under those circumstances, they should file a statement to that effect with the clerk of this court.

against Larsen on the tenth count of the complaint, which alleged violations of CUTPA; (3) reconsider the plaintiff's motion for punitive damages and attorney's fees against Larsen based on the tenth count of the complaint; and (4) conduct a new trial on the thirteenth count of the plaintiff's complaint, which alleged that Pearce Company had violated CUTPA.

In this opinion the other justices concurred.