John B. FENN, Plaintiff,

v.

YALE UNIVERSITY, Defendant.

No. CIV.A.3:96CV1647 CFD.

United States District Court,
D. Connecticut.

Aug. 19, 2003.

Hubert J. Santos, Hope C. Seeley, Santos & Seeley, John J. O'Brien, Jr., Moller, Peck & O'Brien, Hartford, CT, Carole W. Briggs, C.W. Briggs & Associates, PC, Glastonbury, CT, for Plaintiff.

William J. Doyle, Wiggin & Dana, New Haven, CT, Sidney R. Bresnick, New York, NY, for Defendant/Counter–claimant.

John J. O'Brien, Jr., Moller, Peck & O'Brien, Hartford, CT, for Counter–defendant.

### *MEMORANDUM OF DECISION*

DRONEY, District Judge.

The plaintiff, John B. Fenn, brought this action against the defendant, Yale University, alleging conversion, theft, tortious interference with business relationship, and violations of the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen.Stat. § 42–110a, *et seq.,* regarding an invention and patent for that invention, which issued to him as United States Patent No. 5,130,-538 (" '538 patent") on July 14, 1992.[1] Yale has asserted counterclaims against Fenn, seeking an accounting and assignment of the '538 patent, as well as damages for breach of contract and fiduciary duty, fraud, negligent misrepresentation, conversion, theft, unjust enrichment, and CUTPA violations.[2]

The following are the findings of fact and conclusions of law determined by the Court following the bench trial:

### I. Findings of Fact

#### A. Introduction

John B. Fenn ("Dr. Fenn") is a leading scientific expert in the field of mass spec-

---

1. Jurisdiction is based upon diversity of the parties and an amount in controversy exceeding $75,000, pursuant to 28 U.S.C. § 1332(a)(1). Personal and subject matter jurisdiction are uncontested.

2. Yale withdrew its CUTPA claim following the trial. *See* Yale University's Proposed Findings of Fact and Conclusions of Law at 3 n.2.

trometry, which determines the masses of atoms and molecules. Mass spectrometry has important uses in the development of medicines and the mapping of genes.[3] In 1967, Dr. Fenn joined the faculty of Yale University ("Yale") as a tenured full professor. In 1987, as required by Yale's then-mandatory retirement policy, Dr. Fenn retired from his position as a full professor, but continued his work at Yale for another seven years as a "Professor Emeritus" and "Senior Research Scientist." In 1994, Dr. Fenn left Yale and became a research professor at Virginia Commonwealth University.

This case concerns a dispute between Yale and Dr. Fenn over an invention in the field of mass spectrometry which he developed while at Yale. In the following findings of fact, the Court will first address the various Yale policies that concern the inventions of its faculty members such as Dr. Fenn, then the particular policy that applied to him for this invention, then the particular invention here.

## B. Yale's Patent Policy

From before Dr. Fenn joined its faculty, Yale's administrative policies have provided that patentable inventions resulting from a faculty member's research conducted at Yale belong to Yale and not the faculty member unless Yale expressly releases its interest in such inventions.[4]

These policies have also provided, though, that licensing royalties resulting from such inventions would be shared by Yale and the faculty member/inventor. After Dr. Fenn came to Yale in 1967, Yale made changes to its patent policy in 1975, 1984, 1988, and 1989, but these changes dealt primarily with the division of net licensing royalties between Yale and the inventor. The policy that inventions belong to Yale and not the inventor remained unchanged throughout Dr. Fenn's employment at Yale.

In 1967, when Dr. Fenn began his employment at Yale, the Faculty Handbook, dated July 1, 1966, contained provisions about Yale's patent policy with regard to inventions by its faculty members (the "1966 policy"). Pursuant to that policy, a faculty member was required to report to the university any invention resulting from "research conducted under University auspices or with the use of facilities under its control" and Yale owned the invention. The patent policy further stated that Yale did not typically keep title to patents resulting from those inventions; Yale arranged with the "Research Corporation"[5] to carry out the patenting and commercializing of the inventions and to retain title to the subject patents. The policy also indicated that an inventor's share of any net royalty income from such inventions was "usually" 15%. The policy further stated

---

**3.** Dr. Fenn recently won the Nobel Prize for Chemistry for the mass spectrometry invention which is the subject of the instant action.

**4.** These administrative policies concerning patentable inventions are referred to here as the "patent policy."

**5.** The Research Corporation is a non-profit foundation which distributes its total income as grants-in-aid of research to colleges, universities, and scientific institutions. It assists colleges, universities, and scientific institutions in exploiting their employees' inventions by overseeing the patenting and commercial-

izing of those inventions. To that end, the Research Corporation typically holds title to those inventions and divides the net income from the inventions between the inventor and the schools and other institutions. At some point, Yale established its internal Committee on Cooperative Research, Patents and Licensing and Office of Cooperative Research ("OCR") to assist in those functions and supervise inventions by the Yale faculty. The Yale OCR eventually took over most of the functions previously performed by the Research Corporation.

that the University could abandon its interest in an invention and that in such circumstances, "the inventor is free to handle or dispose of his invention as he wishes." Dr. Fenn does not dispute that this patent policy applied to him.

On July 1, 1970, Yale prepared and distributed an updated Faculty Handbook with a section setting forth a patent policy identical to the 1966 policy. Subsequently, Dr. Fenn wrote a letter to Yale's Provost expressing his opinion that the inventor's share of royalty income provided by that patent policy was inadequate.

In 1974, the Yale Provost appointed a committee of faculty and administrators, including Dr. Fenn, to review the patent policy. The committee's work resulted in the 1975 patent policy, which increased the faculty member/inventor's share of net licensing royalties from 15% to 50%. The policy reiterated that all discoveries and inventions which result from "teaching, research, and other intellectual activity performed under University auspices" must be reported to Yale and provided that:

> [t]he [Yale] Treasurer shall refer inventions to Research Corporation or make other arrangements for evaluation of them in accordance with this policy. . . . In addition, the inventor may propose, even though the invention is one in the patenting or licensing of which the University wishes to participate, that the patenting of the invention or the licensing of the patent shall be arranged by the inventor at the inventor's expense, and if his proposal is accepted by the University, he shall proceed in accordance with an agreement to be made between the inventor and the University

providing for such patenting or licensing by the inventor. Finally, if the University decides that although patenting or licensing of an invention is not contrary to University policy or the University does not wish to participate in the patenting or licensing, the University shall release to the inventor the University's interest in the invention, and the inventor shall be free to dispose of the invention as he wishes.

The 1975 patent policy also provided that it was "subject to revocation or amendment by the [Yale] corporation at any time." Dr. Fenn concedes that he was contractually bound by this 1975 patent policy.

In the early 1980s, a committee headed by Yale Professor Clement L. Markert ("the Markert Committee") was convened and charged with the task of reviewing the 1975 patent policy, faculty research sponsored by private entities, and commercial activities of faculty members. The Committee also recognized a need to re-examine the patent policy in light of the Bayh–Dole Act's changes in federal law and a shift in responsibilities from the Research Corporation to the Yale Office of Cooperative Research.[6] Dr. Fenn served on the Markert Committee.

The Markert Committee produced a "Report of the Committee on Cooperative Research, Patents, and Licensing" ("the Markert Report"), setting forth specific recommendations, including changes to Yale's 1975 patent policy. The report's recommendations were embodied in a revised draft of the Faculty Handbook and a revised draft patent policy.[7] Among other

---

**6.** The Bayh–Dole Act, Act of Dec. 12, 1980, Pub.L. 96–517, § 6(a), 94 Stat. 3019, codified at 35 U.S.C. § 200 *et seq.*, grants non-profit organizations exclusive title to inventions developed through federal funding, and allows

them to freely license such inventions for profit so long as such profit is used to fund additional scientific research.

**7.** Several draft patent policies were prepared while the Markert Report was under consid-

things, the Markert Report recommended reducing the share of licensing royalties for faculty members set forth in its 1975 patent policy. In particular, the Markert Report provided that inventors should receive 30% of net royalty income up to $200,000 and 20% of net royalty income in excess of $200,000.[8]

Professor Markert presented Yale's then-president, A. Bartlett Giamatti ("President Giamatti"), with a draft of the Markert Report by letter dated November 18, 1983. In that letter, Professor Markert indicated that the report "represents a consensus of diverse views held by members of the committee." In a reply letter dated November 28, 1983, President Giamatti thanked Professor Markert for the Committee's work and informed him that the Markert Report would be circulated to the faculty for their comments. President Giamatti wrote that "[a]s I receive comments, I will share them with you and the members of the committee. Sometime early in the next semester, having taken into account the advice of the faculty, I will take, with the Provost, the report to the [Yale] Corporation. My intention is to ask the Corporation to approve as university policy those relevant portions of the report." Subsequently, President Giamatti circulated the Markert Committee Report to faculty and research scientists. Dr. Fenn received a copy of the Markert Report.

On February 29, 1984, Dr. Fenn wrote to President Giamatti concerning the Committee's Report. Dr. Fenn wrote: "In the covering letter that accompanied the draft copy of the Report of the Committee on Cooperative Research, Patents and Licensing (CCRPL), Chairman Markert indicated that the views set forth comprised a consensus of the committee membership. Lest you harbor the illusion that this consensus was unanimous I write to record one member's dissent with respect to some of those views." Dr. Fenn's letter set forth his objections to the Markert Report, particularly taking exception to the Committee's recommendation to reduce the inventor's share of royalty income through licensing.

On March 10, 1984, the Yale Corporation[9] "[v]oted, to accept in principle 'the Report of the Committee on Cooperative Research, Patent, and Licenses [the Markert Report].'" On March 23, 1984, President Giamatti responded to Dr. Fenn's February 29, 1984 letter in which he had objected to the Markert Report. In his letter, President Giamatti specifically told Dr. Fenn that "[t]he final draft has been approved by the Corporation in principle. The Report was modified in a few places, specifically with regard to copyright issues, in response to faculty comment." The draft patent policy dated March 6, 1984 became Yale's patent policy on March 10, 1984 through the approval of the Markert Report.[10] As mentioned, that policy

eration. Patent policies were drafted on November 9, 1983, February 14, 1984, and March 6, 1984.

8. The stated goal in the Markert Report was to devise a new formula which was "roughly consistent" with the royalty split set forth in the 1975 patent policy after the shift from the Research Corporation to the Yale Office of Cooperative Research.

9. The Yale Corporation is the senior policy-making body for Yale University. It has nine-

teen members: the President of the University; ten Successor Trustees, who elect their own successors to up to two six-year terms; six Alumni Fellows, who are elected by the alumni for staggered six-year terms; and the Governor and Lieutenant Governor of the State of Connecticut, ex officio.

10. The Court finds such despite the absence of an effective date in the March 6, 1984 policy and in spite of a recently-admitted July 17, 1984 letter by Arthur L. Palmer, Jr., of Phillip Morris, Inc., to Dr. Bickerton referring

provided inventors with 30% of net royalty income achieved through licensing up to $200,000 and 20% of net royalty income in excess of $200,000. The policy also required that inventions be "reported promptly" to Yale and that Yale may release its interest to the inventor should it decide it does not wish and has no legal obligation to participate in the patenting or licensing of the invention. The 1984 policy, like the 1975 patent policy, specifically provided that it was "subject to revocation or amendment by the [Yale] corporation at any time."

In 1986, Yale prepared a revised edition of its Faculty Handbook which contained a section titled "Policy on Patents, Copyrights, and Licensing." The section indicated that a "full statement of the University policies on patent, copyrights, and licensing is available from the Office of the Provost, the Office of Cooperative Research, or the Office of Grant and Contract Administration." The section indicated that licensing royalties would be divided "in accord with the University patent policy," and reiterated that the patent policy required faculty to disclose "[a]ny potentially patentable invention or any potentially licensable computer program" to the Committee on Cooperative Research, Patent, and Licenses through the Office of the Director of Cooperative Research.

In June 1988, the Yale Corporation adopted a patent policy developed by the Committee on Cooperative Research, Patent, and Licenses and published the text of that policy in the October 10–17, 1988 Yale Weekly Bulletin and Calendar. The policy, consistent with the prior policies, stated that "all inventions ... shall be reported promptly in writing to the provost through the director of the Office of Coop-

erative Research" and that "[i]f the University decides that it does not wish and has no legal obligation to participate in the patenting or licensing of an invention, the University may release to the inventor the University's interest in the invention, and the inventor shall then be free to dispose of the invention as he or she wishes." The 1988 policy continued the royalty sharing provisions set forth by the 1984 policy, providing 30% of net royalty income up to $200,000 to the inventor and 20% of net royalty income in excess of $200,000 to the inventor. The policy provided that it was effective as to "all inventions/discoveries made on or after June, 1988." It also provided that it was "subject to revocation or amendment by the [Yale] Corporation."

In October 1989, Yale published another patent policy which it indicated applied retroactively to "all inventions/discoveries made on or after June 1988." Like the policy set forth in the October 1988 bulletin, this policy stated that "all inventions ...shall be reported promptly in writing to the Provost through the Director of the Office of Cooperative Research" and that "[i]f the University decides that it does not wish and has no legal obligation to participate in the patenting or licensing of an invention, the University may release to the inventor the University's interest in the invention, and the inventor shall then be free to dispose of the invention as he or she wishes." The 1989 policy changed the royalty sharing as follows: for the first $100,000, 50% to the inventor; for amounts between $100,000 and $200,000, 40% to the inventor; and for amounts exceeding $200,000, 30% to the inventor. Like all the policies since 1975, it provided that it was "subject to revocation or amendment by the [Yale] Corporation."

---

to the March 6, 1984 policy as a "patent policy draft." The letter appears to be a

response to Dr. Bickerton's inquiry to Palmer seeking an opinion on the 1984 patent policy.

## C. The Invention and Licensing of the '538 Patent

Prior to June 1988, Dr. Fenn, together with Matthias Mann and Chin–Kai Meng, Yale graduate students working with Dr. Fenn at Yale,[11] invented a method for determining the molecular weight of particles through the use of multiply charged ions, which relates to the field of mass spectrometry. The research that led to that invention was conducted under Yale's auspices, on the Yale campus, and was funded by grants from the National Institutes of Health ("NIH") awarded to Yale.

Dr. Fenn first publicly disclosed this invention in San Francisco at the Annual Conference of the American Society for Mass Spectrometry ("ASMS") in June 1988. The paper he presented to the ASMS met the ASMS's novelty requirements because it demonstrated for the first time that the electrospray ionization process could produce ions from large molecules.

Fenn and others recognized the importance of the invention in medical diagnosis and treatment at the 1988 conference because it solved a "longstanding scientific problem" and was believed to "revolutionize the way that one could analyze peptides and proteins." Dr. Mann, Dr. Fenn's co-inventor, believed in 1988 that the invention was "revolutionary" and a "scientific breakthrough."

Dr. Fenn did not disclose the invention to Yale's Office of Cooperative Research ("OCR") in 1988. It was not until April 6, 1989 that Dr. Fenn submitted a completed invention disclosure form to the OCR regarding the invention.[12] However, at least by the end of 1988, Dr. Fenn knew of the great importance of the invention and its commercial value. In his invention disclosure-which only generally and briefly summarized the invention-Dr. Fenn indicated that any patent application would have to be filed by June 1, 1989-within one year of the patent's public disclosure at the San Francisco conference. He also noted that co-inventor Mann would be out of the country until May 15, 1989.

After the Yale OCR received Dr. Fenn's invention disclosure, Dr. Robert Bickerton ("Dr.Bickerton"), the head of the OCR, telephoned Dr. Fenn to find out more about the invention. Dr. Bickerton specifically inquired as to the potential commercial value of the invention. Dr. Fenn stated to Dr. Bickerton that he did not believe the invention had the potential for much commercial value because any patent issued on it would be a "use" patent as opposed to an "apparatus" patent and, as such, it would difficult to protect against its infringement.[13] Dr. Fenn did not disclose that Pfizer Corporation, colleagues at the Yale Medical School and others had previously expressed a strong interest in

11. Messrs. Mann and Meng assigned all of their interests in the invention and patent to Dr. Fenn in August 1990 and they are not parties to this action.

12. In March 1989, Dr. Fenn had requested that Yale assign him and the other inventors title to two previous mass spectrometry inventions with which he was involved that were patented in Yale's name in 1985. On April 6, 1989, Yale refused Dr. Fenn's request.

13. A patent claim for a "use," or "method," is infringed when a business entity or person, without the patent owner's authority, uses patented method in the United States or sells, offers to sell or uses within the United States or imports into the United States, a product that is made by the patented method. 35 U.S.C. § 271. A patent claim for a product or apparatus is infringed when a business entity or person, without the patent owner's authority, makes, uses, sells, or offers to sell a patented product or apparatus in the United States, or imports a patented product or apparatus into the United States. *Id.*

the commercial viability of the invention. Dr. Fenn also did not disclose his own view, and the view of others, that the invention was in fact "revolutionary" or "important" and that it would likely have substantial commercial value.

Dr. Bickerton asked Dr. Fenn if Analytica of Branford, Inc. ("Analytica"), a company founded in 1987 to pursue electrospray technology by Dr. Fenn and Craig Whitehouse, one of Dr. Fenn's former graduate students, would be willing to pay for a patent application in return for Yale's commitment to license the invention to Analytica. As mentioned, Analytica was founded for the purpose of exploiting Dr. Fenn's two previous mass spectrometry inventions, which were owned by Yale, and Dr. Fenn was a 49% shareholder of Analytica. Though Dr. Fenn had already discussed the '538 invention with Mr. Whitehouse, also a 49% shareholder-owner of Analytica, he stated to Dr. Bickerton that he did not know if Analytica would be interested. Contrary to Dr. Fenn's representation to Dr. Bickerton, Dr. Fenn knew that Analytica was very much interested in the invention and its potential for commercial success.

On May 5, 1989, Dr. Bickerton called Dr. Fenn to discuss the invention again. When Dr. Bickerton noted that any patent application would have to be filed within a month, Dr. Fenn replied that he would be "up to his ears" preparing for several upcoming scientific conferences and that, beginning on May 20, 1989, he would be absent from the Yale campus for several weeks in Miami and Europe attending those conferences. Dr. Fenn stated that he was not scheduled to return from Europe until the end of June 1989, after the statutory deadline for filing a patent application had passed. Dr. Fenn did not tell Dr. Bickerton that co-inventor Meng was on the Yale campus during that same period of time and would be available to assist Yale with a patent application.

Dr. Fenn knew at that time that it would be difficult for Yale to prepare a patent application without his assistance in the limited time remaining. He also understood that he would have to assist Yale in preparing a patent application because information far beyond the inventors' disclosure document he gave the OCR would be needed for a proper patent application.

Yale did not file a patent application before the statutory deadline of June 1, 1989.[14] In making this decision, Yale relied on Dr. Fenn's representations about the importance of the invention. Recognizing that Dr. Fenn was an expert in the technology, Yale accepted Dr. Fenn's statement that the invention and any resulting patent would have little commercial value. Dr. Fenn's representation that the invention was of limited value was very significant to the OCR staff and signaled that it should not expend its resources on a patent application.

In his own name and without Yale's knowledge, however, Dr. Fenn filed a patent application for the invention on May 19, 1989, which was financed by Analytica. In an October 19, 1989 letter to Provost Turner regarding the invention, Dr. Fenn continued to conceal from Yale that he had filed the patent application. Dr. Fenn testified that he did so in order to "let[ ] the scheme play out so the incompetence of [the OCR] would emerge." Dr. Fenn stated at trial: ·

---

**14.** 35 U.S.C. § 102 provides, in relevant part: "A person shall be entitled to a patent unless—... (b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States...."

I ha[d] made a number of complaints to Yale, the fact that I thought that [OCR] was incompetent. And here was a case which I had filed a patent application, it had nothing further, and I thought we'll let it go because if it culminates in a patent this will be first rate evidence that I've been trying to convince Yale of for a long time that these guys over there weren't doing their job... And I knew that if I, from Bickerton's previous behavior, confirmed by subsequent behavior, that if I had told him that I had filed a patent application at that time he would have immediately said, well, that belongs to Yale. And there would have been a confrontation. And if no patent issued, the confrontation would have been pointless but, moreover, if the patent didn't issue, then he'd be off the hook in a sense because he could say, well, I knew it wasn't going to result in a patent. So I was essentially making my case.

Dr. Fenn stated that he "was trying to show up how [the OCR] handled its business which in my view was incompetent."

Also in the fall of 1989, Dr. Henry Lowendorf of the Yale OCR, not knowing of Dr. Fenn's pending patent application, wrote to the NIH that "Yale is reporting an invention which was disclosed to NIH on 17 May 1989 to be unpatentable ... The invention is not patentable because enabling information on this invention was published in an abstract, enclosed, at a conference in June of 1988 and Yale did not file a patent application between the time the invention was disclosed to this Office, 6 April 1989, and the one year anniversary of disclosure." Dr. Fenn received a copy of Dr. Lowendorf's letter to NIH. Dr. Fenn knew that this letter was untrue, but he did nothing to correct Dr. Lowendorf's unintentional misrepresentation to the NIH that no patent application had been filed.

Without telling Yale, Dr. Fenn licensed the invention to Analytica on July 31, 1991. On July 14, 1992, United States Patent No. 5,130,538 ("the '538 patent") issued to Dr. Fenn for the "Method of Producing Multiply Charged Ions and for Determining Molecular Weights of Molecules By Use of the Multiply Charged Ions of Molecules." Dr. Fenn also failed to let Yale known of the issuance of the patent.

Yale first learned about the '538 patent when Aldo Test, an attorney for the Finnigan Corporation, wrote to Dr. Bickerton on January 20, 1993 inquiring about the possibility of licensing the '538 patent. Mr. Test explained in his letter that he had tracked the patent to Yale through its NIH grant number. Mr. Test also indicated that the patent had issued to Dr. Fenn, that Analytica claimed control over the licensing of the patent through its assignment from Dr. Fenn, and that Analytica had refused to sub-license the invention to Finnigan. Dr. Fenn received a copy of Mr. Test's letter.

Upon receiving Mr. Test's letter, Dr. Bickerton spoke with Dr. Fenn and forwarded to him a form asking him to assign the patent to Yale pursuant to the patent policy. The form was attached to a letter dated March 2, 1993, in which Dr. Bickerton wrote:

> As we discussed last month, the University recently became aware that you had filed a patent application, and obtained one or more patents, on an invention disclosed by you to my office in 1989. The invention was made by you and your students in the course of research at Yale funded by NIH ... We have looked into the matter and concluded that Yale's patent policy requires that the invention and the patents be assigned to the University. Enclosed is a

standard assignment agreement for your signature.

Yale's Committee on Cooperative Research, Patents and Licensing had determined that Yale was the rightful owner of the invention and '553 patent, and that Dr. Fenn should assign the patent to Yale. Dr. Fenn, nevertheless, refused to assign the patent to Yale.

Concerned with its ability to pursue infringers of the '538 patent because of the question whether its assignment from Dr. Fenn was valid, Analytica then asked Dr. Fenn to also assign the patent to Yale· so that Yale could then license the patent to Analytica. Although Dr. Fenn "thought Analytica had a legitimate concern," he refused to assign the patent to Yale. Analytica then asked Yale for a license to any rights Yale possessed. In a meeting with Dr. Bickerton, Mr. Whitehouse "emphasized the critical nature of the invention to his company and indicated that it was imperative that they have a license." In September 1993, Yale entered into a licensing agreement with Analytica granting Analytica a "worldwide exclusive license in and to any and all interest Yale has or may have in the licensed patents [i.e. '538 patent]."

Since January 30, 1997, Analytica has been paying into escrow amounts calculated pursuant to the royalty provisions of the Fenn–Analytica agreement to which Dr. Fenn would otherwise be entitled. Before Analytica began to deposit the royalties into the escrow accounts, it had paid out $302,435.16 in royalties to Dr. Fenn and his designees in accordance with the Fenn–Analytica license agreement. At the time of trial, the escrowed amounts through the third quarter of 2000 totaled $2,108,820.90. Analytica has been depositing in escrow only amounts calculated pur-

suant to the terms of the Fenn–Analytica agreement and has not also deposited additional amounts calculated pursuant to the Yale–Analytica agreement. Amounts calculated pursuant to the Yale–Analytica agreement total $1,717,975.92 of the $2,108,820.90 in escrow through the third quarter of 2000. Beginning in the first quarter of 1995, Analytica ceased making royalty payments to Yale. Up until that time, Analytica had paid Yale $43,011.30 pursuant to the Yale–Analytica license agreement. At the time of trial, the earned, but unpaid, royalties due Yale under the Yale–Analytica license amounted to $1,760,987.22.

## II. Conclusions of Law

Dr. Fenn's complaint raises claims of conversion, theft, tortious interference with business relationship, and violations of the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen.Stat. § 42–110a, *et seq.* Yale's counterclaims seek an accounting and assignment of the '538 patent, as well as damages for breach of contract and fiduciary duty, fraud, negligent misrepresentation, conversion, theft, and unjust enrichment. Dr. Fenn has asserted special defenses to Yale's counterclaims, including waiver, abandonment and release, estoppel, unclean hands, negligence, and statutes of limitations bars. As the Court generally finds for Yale on all these issues, it will address Yale's counterclaims first.[15]

### A. Yale's Counterclaims

### 1. Breach of Contract

#### a. Dr. Fenn Was Bound by Yale's Patent Policy

■ University patent policies such as Yale's have long been recognized as a valid and enforceable part of the contract of

---

**15.** The parties do not dispute that Connecticut law applies to their claims.

employment. *See Chou v. University of Chicago*, 254 F.3d 1347, 1356–57 (Fed.Cir. 2001); *University of West Virginia Bd. of Trustees v. VanVoorhies*, 84 F.Supp.2d 759, 769–71 (N.D.W.Va.2000) (holding that inventor was bound by university's patent policy, of which he was aware, and with which he had complied on several occasions). This Court has held that "employment agreements [pursuant to which an employee agrees to assign to her employer inventions she developed during the course of employment] are valid and enforceable and [ ] do not violate public policy." *Goldwasser v. Smith Corona Corp.*, 817 F.Supp. 263, 274 (D.Conn.1993), *aff'd* 26 F.3d 137, 1994 WL 89034 (Fed.Cir.1994).

In *Chou v. University of Chicago*, the United States Court of Appeals for the Federal Circuit held that a research assistant was obligated to assign her inventions to the university, based on the university's patent policies. The court noted that "[a]lthough it is true that Chou never signed a contract with the University specifically obligating her to assign her inventions to the University, she accepted her academic appointment subject to the administrative policies of the University." *Chou*, 254 F.3d at 1356–57. Those administrative policies, the court noted, included the university's patent policies, which were set forth in the faculty handbook and included the obligation to assign inventions to the university. The court also noted that the research assistant had previously assigned other inventions to the university without disputing her obligation to do so. *See Chou*, 254 F.3d at 1357.

Here, Dr. Fenn, like Chou, was bound by Yale's administrative policies, including its patent policy. Indeed, as noted above, Dr. Fenn concedes that he was contractually bound by the 1975 patent policy. Dr. Fenn argues, however, that he did not assent to any subsequent patent policies,

and thus, that he was not contractually bound by them. He cites *Torosyan v. Boehringer Ingelheim Pharmaceuticals, Inc.*, 234 Conn. 1, 662 A.2d 89 (1995), as support for his argument. In *Torosyan*, the plaintiff, a chemist, was encouraged by the defendant corporation to move from California to Connecticut to work for it. The plaintiff was orally promised "long term" employment and given an employee handbook that limited the defendant's right to discharge employees, i.e., provided for discharge only "for cause." After the plaintiff was hired and moved to Connecticut, the defendant amended its employee manual to delete the limiting "for cause" language in the employee handbook section dealing with the defendant's right to discharge employees. Thereafter, the plaintiff was fired and the defendant claimed it was not bound by the for cause provision of the earlier employment manual. Affirming the trial court's finding for the plaintiff on its breach of contract claim, the Connecticut Supreme Court held that when an employer issues an employment manual after the employee starts work that substantially interferes with the employee's legitimate expectations about the terms of employment, the employee's continued work after notice of those terms is not conclusive evidence of the employee's consent to those terms.

The instant circumstances differ from those in *Torosyan*. As noted above, Dr. Fenn concedes that he was bound by and consented to Yale's 1975 patent policy. Unlike the employee handbook in *Torosyan*, Yale's 1975 patent policy explicitly provided that Yale could revoke or amend that policy at any time. Yale did amend its patent policy in 1984, 1988, and 1989, each time reserving its right to further amend the policy. Thus, unlike in *Torosyan*, Dr. Fenn has not shown that Yale's amended patent policies in 1984, 1988, and 1989 "substantially interfered" with his le-

gitimate expectations about the terms of employment. Rather, he assented that Yale could amend those policies. Additionally, there was no evidence that he limited his assent to certain provisions of the 1975 patent policy or expressed his refusal to assent to its right to amend provision. Moreover, his continuation of work and compliance with the patent policy for two prior inventions are evidence that he agreed to the changes. Accordingly, the Court does not accept Dr. Fenn's position that only the 1975 patent policy applied to him, but rather, finds that it and the subsequent patent policies applied.

### b. The 1989 Patent Policy Applies to the Invention Here

 The Court also concludes that Yale's 1989 patent policy applied to the '538 invention. The patent policy published in the October 9–16, 1989 Yale Weekly Bulletin and Calendar, became Yale's official patent policy for "all inventions/discoveries made on or after June 1988." Although Dr. Fenn argues that the '538 invention in fact was "discovered" prior to June 1988 (the effective date of the 1989 policy), the meaning of "inventions/discoveries made on or after June 1988" in the 1989 patent policy is not clear from the face of the policy. A court may admit extrinsic evidence to interpret ambiguous language of a contract. *See HLO Land Ownership Assocs. Ltd. P'ship. v. City of Hartford*, 248 Conn. 350, 727 A.2d 1260, 1265 (1999) (citing *Jay Realty, Inc. v. Ahearn Dev. Corp.*, 189 Conn. 52, 453 A.2d 771, 773 (1983)). Accordingly, the Court

employs extrinsic evidence to determine the meaning of the language "inventions/discoveries made on or after June 1988" contained in the 1989 patent policy. Dr. Lowendorf of the Yale OCR testified that Yale considers the date that the faculty member/inventor discloses the invention to Yale to be the date the invention is "discovered" for purposes of determining which patent policy applies because the patent policy requires that all inventions be promptly reported to the OCR. Yale's position on this issue is likely informed by the principle of patent law that the date by which a patent application must be filed is one year from the *public disclosure* of that invention, rather than the discovery date. Accordingly, the Court interprets the language "inventions/discoveries made on or after June 1988" to mean inventions or discoveries *disclosed to Yale on or after June 1988.*

Here, the '538 invention was disclosed to Yale in April 1989. Accordingly, the "invention/discovery" date under the policy is April 1989, and the 1989 patent policy applies.[16] As noted above, although there was a 1988 patent policy, effective June 1, 1988, continuing the 80–20 division of licensing royalties of the 1984 policy, the 1989 policy changed that division to 70–30 and was made retroactive to June 1, 1988, thereby superseding the 1988 policy and its 80–20 division. Accordingly, the 1989 patent policy and its licensing royalty provisions apply as follows: for the first $100,000, 50% to the inventor; for amounts between $100,000 and $200,000, 40% to the

---

**16.** Additionally, even assuming that the '538 invention was "invented/discovered" prior to June 1988, the 1984 patent policy would apply. Though Dr. Fenn argues that the 1984 patent policy was not properly adopted and never became Yale's patent policy, the Court finds that the policy dated March 6, 1984 became Yale's official patent policy on March 10, 1984 through the adoption of the Markert Report by the Yale Corporation. The Court notes, however, that it is Yale's position that the 70–30 split contained in the 1989 policy, rather than the 80–20 split contained in the 1984 and 1988 policies, applies to the '538 invention, notwithstanding that this split is less favorable for Yale.

inventor; and for amounts exceeding $200,000, 30% to the inventor.[17]

### c. Dr. Fenn Breached Yale's 1989 Patent Policy

■ The 1989 patent policy requires that "all inventions ...shall be reported promptly in writing to the Provost through the Director of the Office of Cooperative Research" and that "[i]f the University decides that it does not wish and has no legal obligation to participate in the patenting or licensing of an invention, the University may release to the inventor the University's interest in the invention, and the inventor shall then be free to dispose of the invention as he or she wishes."

As to Yale's counterclaim of breach of contract, the Court concludes that Dr. Fenn violated the 1989 patent policy and committed a material breach of that policy when:

(i) he failed to "promptly" disclose the '538 invention to Yale and, rather, waited nearly a year after the '538 invention's public disclosure and approximately two months prior to the statutory deadline for filing a patent application before notifying Yale that he had discovered the invention;

(ii) he misrepresented the importance and commercial viability of the invention;

(iii) he actively discouraged Yale from preparing and filing a patent application by the statutory deadline while at the same time he was secretly preparing a patent application in his own name;

(iv) he filed a patent application in his own name without notifying Yale and the NIH;

(v) he licensed the '538 invention to Analytica without notifying Yale and the NIH;

(vi) he did not share the resulting licensing income with Yale; and

(vii) he refused to assign the '538 patent to Yale when Yale discovered what he had done and repeatedly asked that he do so.

Accordingly, Yale prevails on its breach of contract claim.[18]

### 2. Breach of Fiduciary Duty

■ Under Connecticut law, "[a] fiduciary or confidential relationship is characterized by a unique degree of trust and confidence between the parties, one of whom has superior knowledge, skill or expertise and is under a duty to represent the interests of the other." *Dunham v. Dunham*, 204 Conn. 303, 322, 528 A.2d 1123, 1133 (1987), *overruled in part on other grounds*, *Santopietro v. New Haven*, 239 Conn. 207, 213, fn. 8, 682 A.2d 106 (1996). It follows that a fiduciary " 'must act in scrupulous good faith and candor ... and with the finest and undivided loyalty to the trust.' " *Martinelli v. Bridgeport Roman Catholic Diocesan Corp.*, 989

---

17. The 1989 patent policy (like the others before it) provides that the divisions are calculated on the "net" royalty income:

Royalties, including license fees or other forms of advance payments, resulting from licensing an invention shall be used first to offset direct expenses incurred by the University in applying for, obtaining and defending a patent ... Expenses for this purpose will include fees paid to outside legal, consulting, and licensing organizations and any out-of-pocket costs incurred by the University ... After recovery of expenses by the University, the remaining royalties will be designated net income ... The royalty net income as defined above shall be divided between the inventor and the University ....

18. As a result, Yale's unjust enrichment claim, plead in the alternative, fails.

F.Supp. 110, 117 (D.Conn.1997) (quoting *Konover Development Corp. v. Zeller*, 228 Conn. 206, 220, 635 A.2d 798, 805 (1994)). The Supreme Court of Connecticut has "specifically refused to define a fiduciary relationship in precise detail and in such a manner as to exclude new situations, choosing instead to leave the bars down for situations in which there is a justifiable trust confided on one side and a resulting superiority and influence on the other." *Alaimo v. Royer*, 188 Conn. 36, 41, 448 A.2d 207, 209 (1982) (citations and internal quotations omitted); *see also Johnson v. Schmitz*, 119 F.Supp.2d 90, 97 (D.Conn. 2000) (recognizing the Connecticut Supreme Court's disinclination to confine the scope of the fiduciary duty doctrine by precise definition and its willingness to allow for case-by-case analysis in new situations); *Dunham*, 204 Conn. at 320–21, 528 A.2d at 1133.

■ Dr. Fenn and Yale had a special relationship of trust and confidence that was different from the usual employer-employee relationship. Yale supported Dr. Fenn's research in the form of facilities, funding, and staff and entrusted Dr. Fenn with the proper management of its NIH grants in the reasonable expectation that Dr. Fenn would use his superior knowledge, skill and expertise to act in good faith and with complete candor and undivided loyalty in connection with the University's research funds and intellectual property, including the '538 invention and related NIH grants.

With respect to Dr. Fenn's work, there was a "justifiable trust confided on [Yale's] side and a resulting superiority and influence on [Dr. Fenn's side]." *Alaimo*, 188 Conn. at 41, 448 A.2d at 209; *see also Dunham*, 204 Conn. at 320–22, 528 A.2d at 1133. Dr. Fenn knew more about the value and patentability of inventions he developed than anyone else, and Yale nec-

essarily sought out and reasonably relied on his expertise in evaluating such inventions. Similarly, Yale was entirely dependent on Dr. Fenn, the inventor, to provide truthful and forthright information regarding the progress and outcome of his federally funded research so that Yale could fulfill its reporting obligations to the NIH pursuant to the Bayh–Dole Act.

■ By virtue of Dr. Fenn's special relationship with Yale and the trust Yale necessarily had to place in Dr. Fenn, Dr. Fenn owed Yale the duties of a fiduciary, including the duties to make full disclosures and maintain an undivided loyalty. Dr. Fenn breached that duty when he failed to promptly disclose the '538 invention to Yale, actively discouraged Yale from preparing and filing a patent application by the statutory deadline while at the same time he was preparing a patent application in his own name, filed a patent application in his own name without notifying Yale, and licensed the '538 invention to Analytica without notifying Yale. Accordingly, Yale also succeeds on its breach of fiduciary duty claim.

### 3. Fraud

■ The Court concludes that the evidence at trial was sufficient to establish that Dr. Fenn engaged in fraudulent misrepresentation and fraudulent nondisclosure. "The essential elements of an action in common law fraud ... are that: (1) a false representation was made as a statement of fact; (2) it was untrue and known to be untrue by the party making it; (3) it was made to induce the other party to act upon it; and (4) the other party did so act upon that false representation to his injury." *Weisman v. Kaspar*, 233 Conn. 531, 539, 661 A.2d 530 (1995). "Fraud by nondisclosure, which expands on the first three of [the] four elements, involves the failure to make a full and fair disclosure of

known facts connected with a matter about which a party has assumed to speak . . . ." *Gelinas v. Gelinas,* 10 Conn.App. 167, 173, 522 A.2d 295, *cert. denied,* 204 Conn. 802, 525 A.2d 965 (1987); *Pacelli Bros. Transportation, Inc. v. Pacelli,* 189 Conn. 401, 407–08, 456 A.2d 325, 328–29 (1983) (intentional withholding of information for purpose of inducing action equivalent to fraudulent misrepresentation); D. Wright, J. Fitzgerald & W. Ackerman, *Connecticut Law of Torts,* § 139 (3d Ed.1991 rev.).

 First, the Court does not credit Dr. Fenn's testimony that he accurately represented to Yale his then belief in the limited commercial viability of the patent because of its nature as a "use patent." It was certainly clear to him by April 1989 that the invention was an important one, likely to be patented, and would likely be of significant commercial value. Yet he failed to be straightforward with Yale about that. In addition, Dr. Fenn misrepresented to Yale Analytica's interest in the invention when Dr. Bickerton inquired about that topic. Though Dr. Fenn had already discussed the '538 invention with Mr. Whitehouse, a 49% shareholder-owner of Analytica, he stated to Dr. Bickerton that he did not know if Analytica would be interested. Contrary to Dr. Fenn's representation to Dr. Bickerton, Dr. Fenn knew that Analytica was very much interested in the invention and in fact was funding the secret patent application.

Additionally, as found above, Dr. Fenn had a contractual duty to promptly disclose the '538 invention to Yale and fiduciary duties to keep Yale adequately informed about patentable inventions. Also, as found above, he breached those duties in failing to promptly disclose the invention or provide adequate and accurate information about the invention or its value and actively discouraging Yale from preparing and filing a patent application by the statutory deadline while he was preparing a patent application in his own name. Dr. Fenn also failed to disclose to Yale his view, and the view of others, that the invention was "revolutionary" or "important." He also filed the patent application in his own name without notifying Yale and licensed the '538 invention to Analytica without notifying Yale. Dr. Fenn acted purposefully and although he maintains it was only to show the "incompetence" of the Yale OCR office, his conduct was also motivated by his personal financial interests.

The Court finds that Dr. Fenn made these misrepresentations and omissions in order to induce Yale not to file a patent application and that Yale relied on Dr. Fenn's actions and information to its detriment in failing to pursue a patent or otherwise follow up with Dr. Fenn on the invention. Dr. Fenn knew that his representations and omissions did not accurately represent the facts concerning the invention and its commercial value. Accordingly, those misrepresentations and omissions constitute fraudulent misrepresentation and fraudulent nondisclosure, and Yale succeeds on its fraud claim.[19]

### 4. Conversion and Civil Theft

As significant issues remain regarding Yale's claims of conversion and civil theft, the Court concludes that further briefing by the parties is necessary. Accordingly, the Court hereby orders the parties to submit within thirty days memoranda addressing: (1) which definition of civil theft (i.e., larceny under Conn. Gen.Stat. § 53a–119) Yale pursued at trial, i.e., whether Yale argued that Dr. Fenn intended to

---

**19.** In light of its findings as to fraud, the Court finds it unnecessary to reach Yale's negligent misrepresentation claim, plead in the alternative.

deprive Yale of its property permanently or intended to dispose of the property for his own benefit; and (2) whether Dr. Fenn's conduct meets any of the definitions of larceny under the Connecticut larceny statute. As a result, the Court makes no findings of law at this time as to the conversion and civil theft counts.

### B. Fenn's Defenses to Yale's Counterclaims

Fenn raises several defenses to Yale's counterclaims. As indicated below, the Court concludes that these defenses lack merit.

#### 1. Waiver

 Dr. Fenn argues that Yale abandoned, released and/or waived its rights to the '538 invention because Yale did not apply for a patent by the statutory deadline. "Waiver" is defined as the "voluntary" and "intentional abandonment of a known right ... It involves the idea of assent, and assent is an act of understanding." *Soares v. Max Services, Inc.*, 42 Conn.App. 147, 175, 679 A.2d 37, 52 (citations and internal quotations omitted), *cert. denied* 239 Conn. 915, 682 A.2d 1005 (1996); *see also McHugh v. McHugh*, 181 Conn. 482, 486–87, 436 A.2d 8, 11 (1980) (holding that waiver of statutory or common-law rights must be voluntary and knowing). Similarly, "abandonment" is "the intentional relinquishment of a known right ... To constitute abandonment there must be an intention to abandon or relinquish accompanied by some act or omission to act by which such intention is manifested ... when [ ] possession is voluntarily forsaken by the owner." *Sharkiewicz v. Lepone*, 139 Conn. 706, 707–08, 96 A.2d 796, 797 (1953) (citations and internal quotations omitted).

 The evidence shows that Yale did not knowingly and intentionally relinquish title to the '538 invention or knowingly and wilfully decide in 1989 not to seek a patent for the invention. Where parties have been fraudulently induced to action or inaction, courts have refused to find that such parties have waived, released or otherwise abandoned their rights, including property rights. *See Pacelli Brothers Transportation, Inc. v. Pacelli*, 189 Conn. 401, 407–09, 456 A.2d 325, 328–29 (1983) (holding that general release could not shield defendant from liability where defendant failed to disclose a misappropriation of corporate funds in breach of fiduciary duty); *Banatoski v. Sheridan*, 1999 WL 545369, *1 (Conn.Super.Ct.1999) ("The general principle that fraud vitiates every transaction and all contracts applies to releases.") (citations and internal quotations omitted).

As the Court found above, Dr. Fenn failed to promptly disclose the '538 invention and fully inform Yale as to its import. Relying on Dr. Fenn's false and misleading information and unaware that he was in the process of pursuing his own patent, Yale determined that it should not file a patent application. Accordingly, the evidence does not establish that Yale knowingly or voluntarily waived or abandoned its rights, interests, or property.

#### 2. Estoppel

 There are two essential elements to an estoppel claim: "the party [against whom estoppel is claimed] must do or say something which is intended or calculated to induce another to believe in the existence of certain facts and to act upon that belief; and the other party, influenced thereby, must actually change his position or do something to his injury which he otherwise would not have done. Estoppel rests on the misleading conduct of one party to the prejudice of the other. In the absence of prejudice, estoppel does

not exist." *W v. W*, 248 Conn. 487, 496–97, 728 A.2d 1076, 1082 (1999). The Connecticut courts have declared that "[n]o one is ever estopped from asserting what would otherwise be his right, unless to allow its assertion would enable him to do a wrong." *W v. W*, 248 Conn. at 496, 728 A.2d at 1082 (citations and internal quotations omitted).

 The Court concludes that the evidence does not support Dr. Fenn's claim of estoppel against Yale. Yale's failure to seek a patent for the '538 invention was the result of Dr. Fenn's failure to promptly disclose the '538 invention and fully inform Yale as to its import. Relying on Dr. Fenn's information and unaware that he was in the process of pursuing his own patent, Yale determined that it should not file a patent application. Thus, though Yale originally declined to seek to patent the '538 invention, Yale's assertion of its rights now does not enable Yale to do a wrong, but rather, serves to correct the wrong that was done to it by Dr. Fenn. Accordingly, Yale should not be estopped from asserting its claims.

### 3. Unclean Hands

 "The doctrine of unclean hands expresses the principle that where a plaintiff seeks equitable relief, he must show that his conduct has been fair, equitable and honest as to the particular controversy in issue." *Thompson v. Orcutt*, 59 Conn. App. 201, 205, 756 A.2d 332, 334 (2000) (citations and internal quotations omitted), *rev'd on other grounds*, 257 Conn. 301, 777 A.2d 670, 2001 WL 850150 (August 7, 2001). Alternatively, the party seeking to invoke the clean hands doctrine to bar equitable relief must show that "his opponent engaged in willful misconduct with regard to the matter in litigation . . . The trial court enjoys broad discretion in determining whether the promotion of public policy and the preservation of the courts'

integrity dictate that the clean hands doctrine is invoked." *Id.* (citations and internal quotations omitted).

 It is well-settled that for the doctrine to apply "[t]he wrong must be done to the defendant himself." *Thompson*, 59 Conn.App. at 206, 756 A.2d at 334 (citations and internal quotations omitted); *see also Cohen*, 182 Conn. at 206, 438 A.2d at 61–62. The clean hands doctrine "is applied not for the protection of the parties but for the protection of the court . . . It is applied . . . for the advancement of right and justice." *Thompson*, 59 Conn.App. at 205, 756 A.2d at 334 (citations and internal quotations omitted); *see also Kulmacz v. New York Life Ins. Co.*, 39 Conn.Supp. 470, 476–77, 466 A.2d 808, 812 (1983) (citations and internal quotations omitted).

 Here, the evidence does not show that Yale has "unclean hands." Again, though Yale initially disclaimed its interest in the '538 invention, it did so because of Dr. Fenn's failure to fully inform Yale as to the invention's import and his actively discouraging Yale to apply for the patent. That Yale pursued its counterclaims after learning the truth about the '538 invention and patent is not unfair, inequitable, or dishonest. Nor did the evidence at trial suggest that Yale engaged in willful misconduct with regard to the matter in litigation. Accordingly, Dr. Fenn's unclean hands defense must fail.

### 4. Negligence

 Dr. Fenn alleges that Yale was negligent in pursuing a patent application for the '538 invention, and thus is precluded by its own negligence from claiming any interest in the invention. The evidence also does not support this defense.

Dr. Bickerton assessed the feasibility of pursuing a patent on the '538 invention in consultation with Dr. Fenn and Dr. Skin-

ner, then Chairman of the Committee on Cooperative Research, Patents, and Licensing. Relying on the information provided by Dr. Fenn, Yale reasonably and justifiably determined that it could not and should not file a patent application. Yale arrived at its decision not to file a patent application in a sensible manner consistent with the patent policy and consistent with the facts it knew then and could reasonably have known. The 1989 patent policy provides that "[t]he Director [of the OCR], with the advice of the Committee on Cooperative Research, Patents, and Licensing, shall conduct an initial screening followed, when indicated by a detailed evaluation of the invention. This may be done through an internal review." Yale's conduct was appropriate and reasonable in the circumstances.

### 5. Statutes of Limitations

 Dr. Fenn claims that the applicable statutes of limitations bar Yale's fraud, negligent misrepresentation, conversion, and civil theft counterclaims.[20]

C.G.S.A. § 52–577 provides that "[n]o action founded upon a tort shall be brought but within three years from the date of the act or omission complained of." Yale's claim of fraud is subject to this three-year limitations period. *See In re Colonial Ltd. Partnership Litigation*, 854 F.Supp. 64, 90 (D.Conn.1994) (fraud).

 C.G.S.A. § 52–577 is an "occurrence" statute so that the three-year period within which a party must assert its

tort claims begins to run the moment the act, injury and/or omission complained of occurs. *See Collum v. Chapin*, 40 Conn. App. 449, 451–52, 671 A.2d 1329, 1331 (1996); *In re Colonial Ltd. Partnership Litigation*, 854 F.Supp. at 90 (holding, in securities fraud case, that "act or omission complained of" for C.G.S.A. § 52–577 limitations purposes occurs when false and misleading information is received). Nevertheless, the limitations period must be tolled when defendants like Dr. Fenn have fraudulently concealed the existence of a cause of action and/or have breached their ongoing fiduciary duties of disclosure. *See In re Colonial Ltd. Partnership Litigation*, 854 F.Supp. at 90 (holding that limitations period for common-law tort claims, including claims for fraud, negligent misrepresentation and breach of fiduciary duty may be tolled by fraudulent concealment); *Gibbons*, 983 F.Supp. at 315–16.

 Conn. Gen.Stat. § 52–595 provides the basis for such tolling.[21] Section 52–595 provides that "[i]f any person, liable to an action by another, fraudulently conceals from him the existence of the cause of such action, such cause of action shall be deemed to accrue against such person so liable therefor at the time when the person entitled to sue thereon first discovers its existence." Although the fraudulent concealment tolling statute generally requires an affirmative act of concealment beyond mere silence, non-disclosures are sufficient where, as here, the defendant is under a fiduciary duty to disclose material facts.

---

**20.** As the Court has rejected Yale's negligent misrepresentation claim and declined to reach its conversion and civil theft claims in this opinion, it need only reach Dr. Fenn's statute of limitations argument as to Yale's claim of fraud. Also, Dr. Fenn does not raise a statute of limitations argument as to Yale's breach of contract or breach of fiduciary duty counterclaims.

**21.** The Connecticut Supreme Court has held that "the exception contained in section 52–595 constitutes a clear and unambiguous general exception to any statute of limitations that does not specifically preclude its application." *Connell v. Colwell,* 214 Conn. 242, 246 n. 4, 571 A.2d 116 (1990). Section 52–577 does not specifically preclude the application of the tolling statute.

*See Martinelli,* 989 F.Supp. at 115–116 (holding that requirement of affirmative act of concealment for purposes of tolling limitations period not applicable when defendant under affirmative fiduciary duty to disclose); *In re Colonial Partnership Litigation,* 854 F.Supp. at 90. The evidence in this case shows that Dr. Fenn engaged in affirmative acts that were designed to and did conceal his wrongful conduct from Yale.

 Fraudulent concealment for purposes of tolling the statute of limitations must not be presumed, but must be "strictly proven with clear, precise and unequivocal evidence." *Gibbons,* 983 F.Supp. at 316 (citations and internal quotations omitted); *Puro v. Henry,* 188 Conn. 301, 308–09, 449 A.2d 176, 179 (1982). Nonetheless, a reasonable inference that a defendant's acts of concealment were aimed at delaying or preventing legal action is a recognized basis upon which to toll the statute of limitations. *See Martinelli,* 989 F.Supp. at 115; *Puro,* 188 Conn. at 310, 449 A.2d at 180 (holding that fraud may be presumed by circumstantial evidence; the "test of the sufficiency of proof by circumstantial evidence is whether rational minds could reasonably and logically draw the inference").

Here, the three year limitations period is tolled pursuant to C.G.S.A. § 52–595 because the evidence establishes: (i) Dr. Fenn's actual awareness of the facts necessary to establish Yale's causes of action; (ii) his intentional concealment of these facts from Yale; and (iii) his concealment of the facts was done to mislead Yale into inaction. *See Gibbons,* 983 F.Supp. at 315; *Zimmerer v. General Elec. Co.,* 126 F.Supp. 690, 693 (D.Conn.1954) (holding that to establish fraudulent concealment plaintiff must show that he was ignorant of existence of right of action and that defendant intended that plaintiff be kept in ignorance).

As detailed earlier, Dr. Fenn, in violation of his fiduciary duties to Yale, deceived Yale about the fact that, in violation of Yale's patent policy and federal law (his responsibilities under the NIH grants), he had patented and licensed the invention in his own name. He also actively misled Yale about whether the invention should be patented. Dr. Fenn fraudulently concealed the truth with the specific intent of preventing Yale from asserting its rights. For example, Dr. Fenn testified:

> I knew ... from Bickerton's previous behavior, confirmed by subsequent behavior, that if I had told him that I had filed a patent application at that time he would have immediately said, well, that belongs to Yale. And there would have been a confrontation.

As a result of Dr. Fenn's ongoing fraudulent concealment, Yale did not discover, and could not reasonably have discovered, that it had suffered actionable harm until January 20, 1993 when Aldo Test, an attorney for the Finnegan Corporation, wrote a letter to Dr. Bickerton asking for a sublicense to the '538 patent. Dr. Fenn's own testimony confirms that prior to this time "neither NIH nor Yale recognized the invention and the substance of it." [22]

---

**22.** The Court disagrees with Dr. Fenn's claim that Yale should have been alerted in February 1992 that Dr. Fenn had filed an application for the '538 patent because of (1) a conversation that Dr. Howard Jenerick of the NIH had with Dr. Bickerton about Attorney Aldo Test's letter to the NIH dated January 16, 1992 (Pl.Ex. 77); and (2) Dr. Lowendorf's May 21, 1992 memo to Dr. Bickerton about his conversation with Attorney Robert Green (Pl.Ex. 85). In each of those documents, the parties writing to Dr. Bickerton referenced a patent that issued in May 1989 regarding the electrospray technology. The Court concludes that it was reasonable for Dr. Bickerton to believe that Mr. Test and Mr. Green were

Accordingly, pursuant to C.G.S.A. § 52–595, Yale's claim of fraud accrued on or about January 20, 1993 for statute of limitations purposes. *See Goldwasser*, 817 F.Supp. at 270–72.

 Because of the special relationship between Dr. Fenn and Yale, Dr. Fenn had a continuing duty to keep Yale fully informed. His "continuing course of conduct" in failing to do so provides an alternative and independent ground for tolling the statute of limitations. To support a finding of a "continuing course of conduct" sufficient to toll the applicable statute of limitations, "there must be evidence of the breach of a duty that remained in existence after commission of the original wrong related thereto. That duty must not have terminated prior to the commencement of the period allowed for bringing an action for such a wrong, and it may be found where there is a special relationship between the parties giving rise to a continuing duty, or later wrongful conduct by the defendant related to the prior wrongful act." *In re Kellogg*, 166 B.R. 504, 507–508 (Bankr.D.Conn.1994) (citations omitted); *see also Fichera v. Mine Hill Corp.*, 207 Conn. 204, 209–10, 541 A.2d 472, 474–75 (1988).

As Yale's fiduciary, Dr. Fenn had an ongoing and continuing duty to act in Yale's interest, to disclose the facts, and to rectify his prior deceptions. *See In re Kellogg*, 166 B.R. at 509; *Fichera*, 207 Conn. at 209–10, 541 A.2d at 474–75. Dr. Fenn, however, intentionally set upon a "continuing course of conduct" in dereliction of his fiduciary duties of candor, undivided loyalty and good faith. In these circumstances, the applicable three-year statute of limitations did not begin to run until January 1993, when Yale learned the

truth. *See, e.g., City of West Haven v. Commercial Union Ins. Co.*, 894 F.2d 540, 546 (2d Cir.1990) (holding that insurer's continuing duty to defend its insured created a "special relationship" between the parties sufficient to toll CUTPA's statute of limitations).

Yale was not required to bring its claims by January 1996—three years after it learned of Dr. Fenn's wrongdoing—because Dr. Fenn and Yale entered into statutes of limitations tolling agreements dated March 17, 1995, and December 1, 1995, which exclude the one year and eight month period of time between March 17, 1995, and December 17, 1996, from the calculation of the three year statute of limitations period. Accordingly, Yale had until September 1997 to file the claims it filed in this action in November 1996.

Accordingly, the fraud counterclaim is not barred by the statute of limitations.

## C. Fenn's Claims

The Court concludes that Dr. Fenn has failed to prove his claims against Yale. Dr. Fenn maintains that in giving Analytica a "quit claim" license to any rights it might have in the '538 invention, Yale wrongfully assumed ownership and control over the patent and converted it (first count), stole the patent under C.G.S.A. § 52–564 (second count) and tortiously interfered with Dr. Fenn's business relationship with Analytica (third count). Dr. Fenn also claims that Yale's actions constituted CUTPA violations (fourth count). The record shows, however, that Yale, and not Dr. Fenn, is the rightful owner of the '538 invention and patent. Accordingly, Fenn's conversion and theft claims fail.

---

referring to an earlier Fenn invention that had been patented, not the invention which led to the '538 patent.

■ Moreover, there is nothing in the Yale–Analytica license agreement that would interfere with Dr. Fenn's rights even if he had been the rightful owner of the '538 invention and patent because the agreement simply grants Analytica a license to any rights that Yale might have in the '538 invention and patent. Yale made no representation in the agreement that it had any rights, and nothing in the agreement interferes in any way with Dr. Fenn's agreement with Analytica.

■ The classic elements of tortious interference are "the existence of a contractual or beneficial relationship, defendant's knowledge of that relationship, the intent to interfere with it, and the consequent actual loss suffered by the plaintiff." *Hart, Nininger and Campbell Assoc., Inc. v. Rogers,* 16 Conn.App. 619, 629, 548 A.2d 758, 764 (1988). In addition, the plaintiff must "plead and prove at least some improper motive or improper means ... A claim is made out [only] when interference resulting in injury to another is wrongful by some measure beyond the fact of the interference itself." *Blake v. Levy,* 191 Conn. 257, 262, 464 A.2d 52, 55 (1983) (citations and internal quotations omitted); *see Robert S. Weiss and Assoc., Inc. v. Wiederlight,* 208 Conn. 525, 536, 546 A.2d 216, 223 (1988) (citing to *Blake* ); *Golembeski v. Metichewan Grange No. 190,* 20 Conn.App. 699, 702–03, 569 A.2d 1157, 1159–60, *cert. denied,* 214 Conn. 809, 573 A.2d 320 (1990). This element of "improper motive or improper means" may be satisfied by proof that "the defendant was guilty of fraud, misrepresentation, intimidation or molestation ... or that the defendant acted maliciously." *Blake,* 191 Conn. at 261, 464 A.2d at 54 (citations omitted); *see Robert S. Weiss and Assoc., Inc.,* 208 Conn. at 536, 546 A.2d at 223 (citing to *Blake* ); *Golembeski,* 20 Conn. App. at 702–03, 569 A.2d at 1159–60 (citing

to *Blake* ). "Not every act that disturbs a contract or business expectancy is actionable." *Blake,* 191 Conn. at 260, 464 A.2d at 54; *see Robert S. Weiss and Assoc., Inc.,* 208 Conn. at 535–536, 546 A.2d at 223 (citing to *Blake* ); *Golembeski,* 20 Conn. App. at 702, 569 A.2d at 1159–60.

Dr. Fenn testified that he "saw no harm in [the Yale–Analytica license agreement]." Indeed, as Dr. Fenn admitted at trial, the Yale–Analytica "quitclaim" agreement was in fact beneficial to him as an owner of Analytica because it allowed Analytica to defeat Finnegan's claim that Analytica lacked standing to maintain its patent infringement action.

■ The Court also concludes that Dr. Fenn's CUTPA claims fail. CUTPA provides that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen.Stat. § 42–110b(a). Trade or commerce under CUTPA is defined as "the advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and real property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value in this state." Conn. Gen.Stat. § 42–110a(4). "However, 'although an employer may engage employees for the purpose of promoting trade or commerce, the actual employment relationship is not itself trade or commerce for the purpose of CUTPA.'" *Drybrough v. Acxiom Corp.,* 172 F.Supp.2d 366, 369 (D.Conn.2001) (quoting *Quimby v. Kimberly Clark Corp.,* 28 Conn.App. 660, 613 A.2d 838, 844 (1992)). When an employment relationship exists between two parties, actions taken outside the confines of that relationship may constitute violations of CUTPA. *See Larsen Chelsey Realty Co. v. Larsen,* 232 Conn. 480, 656 A.2d 1009, 1018 (1995) (quotations and citations

omitted). To determine whether certain actions fall within or outside the employment relationship, the defendant's conduct-not the employment relationship-is dispositive. *See Fink v. Golenbock,* 238 Conn. 183, 680 A.2d 1243, 1260 (1996); *Larsen Chelsey,* 656 A.2d at 1017.

Here, even assuming without deciding that CUTPA applies to Yale's actions, the Court concludes that nothing in the record indicates that Yale engaged in any unfair or deceptive conduct or otherwise committed a violation of CUTPA. As noted above, Yale's actions in declining to file a patent application and subsequently seeking a quitclaim from Analytica after learning of the patent's existence and value (and after Dr. Fenn's refusal to assign the patent to Yale) were reasonable and justifiable under the circumstances. Yale's actions were also consistent with its patent policy, to which Dr. Fenn assented. Accordingly, the Court finds no CUTPA violation.

### III. Conclusion

Dr. Fenn's contributions to the science of mass spectrometry, including the invention that led to the '538 patent, are significant and beneficial to many. As evidenced by his receipt of the 2002 Nobel Prize for Chemistry, the invention that led to the '538 patent is one of far-reaching import and magnitude. Indeed, the Nobel Foundation stated that the invention has "revolutionised the development of new pharmaceuticals" and that "[p]romising applications are also being reported in other areas, for example foodstuff control and early diagnosis of breast cancer and prostate cancer." The Nobel Foundation, *Press Release: The Nobel Prize in Chemistry 2002, at* http:// www.nobel.se/chemistry/laureates/2002/press.html.

However, Dr. Fenn failed to promptly disclose the '538 invention to Yale, misrepresented its importance and commercial viability, and actively discouraged Yale from preparing and filing a patent application by the statutory deadline. At the same time, Dr. Fenn secretly prepared a patent application in his own name and licensed the '538 invention to Analytica without notifying Yale and the NIH. Those actions not only violated Dr. Fenn's obligations to Yale, but also violated Connecticut state law. Moreover, his actions were intentional and without justification.

Accordingly, the Court finds for the defendant and counter-plaintiff, Yale University, as indicated above. However, in order to fashion a judgment consistent with this memorandum of decision, the Court directs the parties to file supplemental papers.

Specifically, the Court hereby orders the parties to file proposed findings of fact with factual support and proposed orders concerning the relief requested by Yale. The parties shall address: (1) Yale's request for an accounting/assignment of the patent; (2) the amount of damages under the 1989 patent policy and how they should be awarded; and (3) whether punitive damages should be awarded and their amount, including proof as to reasonable attorney's fees.[23] Those proposed findings and orders are due within thirty days of the date of this order. Both parties are also ordered to file memoranda regarding Yale's theft and conversion claims within thirty days.[24]

---

**23.** In the Court's Final Pretrial Order, at paragraph 4, the Court, in accordance with

the parties' stipulation, bifurcated the issue of the amount of attorney's fees to be awarded.

**24.** The parties are also to indicate whether an

additional factual hearing is necessary.